312 A.2d 725.

HARVEY C. SIMMONS *vs.* TOWN COUNCIL OF
THE TOWN OF COVENTRY *et al.*

DECEMBER 13, 1973.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. Harvey C. Simmons was the chief of the Coventry Police Department. On February 28, 1972, he was fired by the town council after a hearing on a charge of insubordination. Simmons appealed his firing to the Su-

perior Court where a nonjury trial was held. The trial justice affirmed the firing and Simmons thereafter filed his notice of appeal. The pertinent records are now before us. Before proceeding further, we must take note of a procedural deficiency.

In seeking to regain his position, the appellant first sought judicial assistance by invoking the provisions of G. L. 1956 (1970 Reenactment) §45-20-1.1. This section permits a police officer who may have been disciplined because of charges "involving moral turpitude or violation of departmental regulations" to take an appeal to the Superior Court where he shall be entitled to a "* * * trial de novo before a justice of the superior court without a jury." The trial justice is authorized to modify the action taken by the municipal officials in several respects. He (or she) may restore the officer to his former rank, revoke a suspension, reduce the penalty or approve a proposed transfer provided that the transfer shall not reduce the officer's salary.

However, the legislation which was enacted in 1968[1] does not provide any vehicle for a judicial review of the actions taken in the Superior Court. A similar situation occurred in 1969[2] when the Legislature substituted the Superior Court for this court as the tribunal having original appellate jurisdiction to review decisions of zoning boards. In *Bassi* v. *Zoning Board*, 107 R. I. 702, 271 A.2d 210 (1970), we acknowledged the Legislature's right to limit the right of appeal but pointed out that this right is subject to the provisions of art. XII of the amendments to the state constitution which specifically reserves to this court the power to exercise "* * * final revisory and appellate jurisdiction upon all questions of law and equity." This

---

[1] Public Laws 1968, ch. 242.

[2] Public Laws 1969, ch. 239, sec. 48, now cited as G. L. 1956 (1970 Reenactment) §45-24-20.

revisory and appellate jurisdiction over inferior tribunals is exercised by our power to issue prerogative writs. *Higgins* v. *Tax Assessor*, 27 R. I. 401, 63 A. 34 (1905).

One of the prerogative writs is certiorari. We can and will in appropriate circumstances fashion our own writ. *Hester* v. *Timothy*, 108 R. I. 376, 275 A.2d 637 (1971).

Since this is the first time[3] a police officer, who, having properly employed the provisions of §45-20-1.1, seeks an appellate review of the Superior Court's consideration of a municipality's disposition of an alleged breach of discipline, we will treat Simmons's notice of appeal as the equivalent of a writ of certiorari issued by this court for the sole purpose of reviewing the Superior Court's affirmance of his dismissal.

The record shows that after some 11 years of service as a member of the Rhode Island State Police, Simmons assumed the office of Coventry's police chief in February, 1969. During the early morning hours of Valentine's Day, February 14, 1972, he was allegedly involved in an assault and battery incident which took place in Coventry. At 5:15 a.m., Simmons conferred with the town solicitor and two councilmen. He agreed to take a leave of absence. He personally typed and signed a request in which he asked the council's permission for a leave of absence. In his request Simmons declared that, since his department was investigating an incident in which he was a potential witness, it

---

[3]The statutory predecessor to G. L. 1956 (1970 Reenactment) §45-20-1.1 was P. L. 1948, ch. 2083. This statute permitted any policeman or firefighter who was dismissed on charges involving moral turpitude to seek a review in the Superior Court by way of certiorari. In *Carlson* v. *McLyman*, 77 R. I. 177, 74 A.2d 853 (1950), we took note of the General Assembly's restriction of a judicial review to the Superior Court and treated Carlson's bill of exceptions as a writ of certiorari. The 1968 legislation affords a policeman a much broader type of review and greater relief by an appeal to the Superior Court than the 1948 statute.

would be in the best interest of the department if he took a leave.

Edward J. Jacques was president of the town council. He sells life insurance. During the time span covered by this controversy, it is doubtful that he sold much insurance. He was at the town hall[4] for the very early morning Valentine Day's conference with Simmons. Later the same day he returned to the town hall and presided at a regular council meeting at which Simmons's request for a leave was granted. The leave was with pay. Four days later, on the afternoon of February 18, he received a telephone call from Simmons's attorney. The attorney told the president that he and his client would like to meet with the councilman and discuss Simmons's plan to return to work on the following day. The president's reply was, "No chance. We will speak with the whole council or not at all." The president told the attorney that his client was not to return to work until the council had given him the green light. The attorney informed the president that a sheriff would deliver a letter to him informng him of Simmons's intent to report for duty on February 19.

Approximately two hours later, Simmons's attorney, the sheriff of Kent County, a newspaper reporter, and a photographer appeared at Jacques's residence. Simmons waited at the curb in his attorney's automobile. A letter was handed to Jacques by the sheriff. The communication, which was on police department stationery, informed the president of Simmons's intent to resume his duties as chief on the following day. The letter which is set out in military style is headed, "Subject. Revocation Of Leave Of Absence." In his communication Simmons expressed pleasure that the Attorney General's Department was going to

---

[4] In Coventry, the town hall is called the town house. The council chambers are on the first floor. Police headquarters are found in the basement.

investigate "the happenings in the Town of Coventry" and informed Jacques that he was going to resume his duties as chief at 8 o'clock the following morning. When asked by the attorney whether his client's letter would receive immediate consideration, Councilman Jacques replied that the matter would be considered at the next council meeting—the evening of February 28.

Shortly after the quartet left his home, Jacques conferred with his fellow councilmen. As a result of their conversations, two letters were drafted and signed by the council president. One was addressed to Simmons and the other to Captain Victor R. Pajak, the acting chief. Simmons's letter was entitled, "Subject. Reply To Communication Dated February 18 1972 Entitled Revocation Of Leave Of Absence." It reads as follows:

> "Because the Coventry Town Council on Feb. 14, 1972 by Resolution accepted your leave of absence and by that Resolution accepted your leave of absence until such time as this matter for which the Leave of Absence was accepted has come to a Final Determination and since this was a Coventry Town Council action in the first instance the Coventry Town Council will be glad to review your request at its next regularly schedule Town Council Meeting on February 28, 1972."

The letter was signed by the council president. The letter to Captain Pajak ordered him to continue serving as the acting chief.

The letters were apparently prepared in the first-floor portion of the town hall. Simmons's letter was taken to the basement headquarters and placed in the chief's mail box. Sometime during the evening, Simmons received an anonymous telephone call informing him that there was a letter "in your box" at headquarters. Simmons, who was entertaining some fellow officers, called the station and asked that the letter be delivered to his home. The department's day sheet for Saturday, February 19, has an entry at "0050

Hrs." showing that "Officer Phillips delivered letter to the Chief." Upon its receipt, Simmons placed it unopened upon a buffet and continued to entertain guests.

After their departure, he went to bed without reading the letter. The next morning, he and the unopened letter appeared at police headquarters. There, in the presence of a reporter and a photographer, he opened and read the letter and then passed it along to the reporter, asking the reporter if he understood its contents. The day sheet shows that at "0753 Hrs." "Chief Simmons" reported for duty. This record also discloses that representatives of the press had arrived some 20 minutes earlier.

Shortly after his takeover, Simmons directed a sergeant to tell Captain Pajak to return the chief's cruiser to him. Pajak, in turn, telephoned Jacques and informed him of the day's developments. Jacques, who had left his wife at the hairdressers and then had his car break down, put aside his personal obligations and turned his attention to resolving the question of the two police chiefs. He told the acting chief to surrender only the keys, not any responsibility as head of the police department. At noon, the council assembled in the town hall and met in special session. It suspended Simmons as chief and as a member of the department. Notice of its action was given to Simmons. The notice also informed Simmons of his right to a hearing on the insubordination charge and made it clear that, in absence of an appeal, his employment would terminate on February 29. He appealed and a hearing was held before the council on February 28. A majority[5] of the council found that the insubordination charge was warranted and then discharged Simmons.

Simmons contends that his February 19 return to work

---

[5]The vote was 4 to 1. The dissenting councilman testified in the Superior Court. He agreed that Simmons was insubordinate but differed on the punishment.

cannot be classified as insubordination. At most, he says, his actions arose from a mistaken belief that he could terminate his leave at any time and resume his duties as chief. He also claims that the council never indicated to him that.he needed its o.k. before he could regain possession of his chief's car, badge and gun. Simmons pictures himself as the innocent victim of what might be called a monumental misunderstanding.

In assaying Simmons's arguments, we must bear in mind that in certiorari we do not exercise a fact-finding function. Ours is a limited review. We examine the record of the tribunal under scrutiny to determine if there is any legal evidence to support the action it has taken. *Lantini* v. *Daniels*, 104 R. I. 572, 247 A.2d 298 (1968); *Hooper* v. *Goldstein*, 104 R. I. 32, 241 A.2d 809 (1968); *Henry* v. *Thomas*, 100 R. I. 564, 217 A.2d 668 (1964).

The difficulty facing Simmons as he appears before us is posed by the fact findings made by the trial justice in a well-reasoned written decision wherein he concluded that there was no misunderstanding as to what occurred in Coventry during the five days following February 14. He found that Simmons was aware not only that he had no "unrestricted" right to return to work but also that his return as chief could not take place until the council met on February 28 and considered his request to resume his position.

Simmons was no neophyte when he applied as Coventry's police chief in early 1969. He had spent some 11 years with the state police. As the top police official in the town he was responsible to the council for the proper execution of the duties of his office. As the trial justice so well points out, his request for leave was an implicit recognition of this obligation. The council's approval of his request served to excuse his absence from work and

permitted the transfer of the chief's responsibilities to Captain Pajak.

Simmons's allegation about the self-termination aspect of his leave is rebutted by his actions. His attorney first sought the aid of the council's chief executive. When this failed, he brought the sheriff and the press into the act with the delivery of the letter announcing his unilateral revocation of his leave. Such conduct is truly inconsistent with the behavior of one who believes he has an unqualified right to take over as chief. Further, when the two "chiefs" met on the morning of February 19, Simmons remarked to Pajak, "Vic, I don't know what the Town Council has told you, but until I receive formal notice of presentation of charges, I am still the chief of police." The trial justice stressed that these words showed that Simmons was aware that his action in returning would meet with reaction by the council.

In seeking to buttress his theory of misunderstanding rather than deliberate defiance, Simmons maintained that he returned to work because he knew that the Attorney General's investigation had terminated. However, in cross-examination, he conceded that he did not know of the investigation's completion but assumed it to have been completed.

Even though the council's February 18 order to Simmons cannot be considered as a model of clarity, the trial justice measured its contents against the background of the council president's earlier conversation with Simmons's attorney, Simmons's knowledge that the investigation was continuing, his belated reading of the order, Simmons's admitted "feeling" that the order was the result of his attorney's call to Jacques together with the confrontation at the Jacques's residence, and consequently the trial justice described Siimmons's reporting for duty on Febru-

ary 19 as "* * * an act done with the knowledge that it was contrary to the dictates of his superior."

Having made the finding of deliberate disobedience, the trial justice then went on to consider what was the appropriate punishment. Earlier in his Coventry service, Simmons had encountered some type of difficulty that had caused the council to place him "on probation for six months." The trial justice alluded to this fact and then described Simmons's actions of February 18 and 19 as presenting the council with an accomplished fact, and daring it to undo what he had done.

In affirming the council's discharge of Simmons, the trial justice made the following observations:

"The efficient operation of that department calls upon the chief to command the respect and obedience of his subordinates. This however entails his own demonstration of respect and obedience to his own superiors who, in the last analysis, are the people themselves. When he challenges the town council he challenges the people of Coventry and if strength is to be maintained in the fabric of the department his action here cannot be countenanced. However wrong in its official orders the town council may be in any given situation, he must first obey. That forum is thereafter open to him, as it is to any other citizen of the town, if in his judgment there ought to be a public disclosure that his obedience was not in the best interests of the people or the department or both. To permit the plaintiff to return to the department following his act of insubordination would, in the judgment of this Court, erode the authority of the defendant town council in the future administration of its police department."

We can add little more. Earlier, in *Howland* v. *Thomas,* 98 R. I. 470, 204 A.2d 640 (1964), this court observed that police officers in many respects constitute a military organization and are subject to disciplinary methods that

are "peculiarly incident to the efficient functioning" of their department.

There is a compelling public interest in preserving and maintaining an efficient and effective police department. A police officer's primary duty is to enforce and uphold the law. To the citizenry, he should represent the epitome of law and order. He must present an image of personal integrity and ability in order to command the respect of the public, particularly in a small community such as Coventry. *See Moorestown Tp.* v. *Armstrong,* 89 N. J. Super. 560, 215 A.2d 775 (1965). The departmental tone which will assist each officer to attain these goals is set by the man at the top — if the chief's conduct is not exemplary, what can be expected of the man in the ranks? Hand in hand with the prestige that goes with driving the chief's car goes the responsibility that is an integral part of that office.

The record before us shows that qualities enumerated here were lacking in Simmons particularly during the time he threw down the gauntlet and challenged the town council's authority over its police personnel. The evidence before the trial justice supported the finding of insubordination. Simmons's dismissal as chief and as a member of the Coventry Police Department was appropriate and finds support in the record before us.

For the reasons stated, the plaintiff's appeal is denied and dismissed.

*Felix A. Appolonia,* for appellant.

*Frank J. Williams,* Town Solicitor, for appellee.