### GEORGIA RY. & POWER CO. v. RAILROAD COMMISSION OF GEORGIA.

(District Court, N. D. Georgia.  January 26, 1922.)

1. **Public service commissions ☞23—Action reviewable by federal court only on constitutional grounds.**

    The action of a public service commission in prescribing rates to be charged by a public utility corporation is reviewable by a federal court only on the question whether it is an invasion of constitutional rights, and such collateral questions as are incidental thereto, and the presumption is in favor of its validity.

2. **Public service commissions ☞7—Value of franchise held properly excluded in fixing rates for a public utility.**

    A franchise for a public utility is granted on the implied condition that it shall be used for the public benefit and at reasonable rates of charge to the public, and in the computation of the value of the property used in the service by a public service commission for the purpose of establishing reasonable rates, which is only a method of enforcing such implied contract, the value of the franchise should not be taken into consideration, as it is neither taken nor impaired, but its use required according to the original contract.

3. **Public service commissions ☞7—Valuation of physical property.**

    In ascertaining the present value of physical property for rate-fixing purposes in a period of changing values, a decided tendency to higher or lower may be recognized and considered.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Public service commissions ☞7—Past earnings are not an element to be considered in fixing future rates.**

In establishing reasonable rates for a public service corporation, failure to earn a fair return in past years is not a factor to be considered, either by adding the deficiency to capital investment or amortizing it in future rates.

**5. Public service commissions ☞7—Income tax not allowable as an expense.**

In establishing rates for a public service corporation, the federal income tax is not allowable as an expense of the business.

In Equity. Suit by the Georgia Railway & Power Company against the Railroad Commission of Georgia. On motion for preliminary injunction. Denied.

Spalding, MacDougald & Sibley. Colquitt & Conyers, Rosser, Slaton, Phillips & Hopkins, L. C. & J. L. Hopkins, and J. Prince Webster, all of Atlanta, Ga., for plaintiff.

E. J. Reagan, of McDonough, Ga., for defendant.

Before BRYAN, Circuit Judge, and JACK and SIBLEY, District Judges.

SIBLEY, District Judge. By legislative act of February 16, 1856 (Laws Ga. 1855–56, p. 420), Atlanta Gaslight Company was granted a perpetual charter, with a franchise to make and sell gas for lighting purposes, in the city of Atlanta, and to lay its pipes and apparatus in the streets, alleys, and public grounds therein. By Act October 14, 1889 (Laws Ga. 1889, p. 1398), the franchise was extended to the furnishing of gas and electricity for all advantageous uses. No monopoly was granted, but one in fact exists. Many years since, the gas company leased its property and franchises to the Georgia Railway & Power Company, which has since operated them. This company voluntarily established a rate based on $1 per 1,000 feet, which was used until November 1, 1918, when, on application to the Georgia Railroad Commission, which by law has authority to fix maximum rates for gas and other public utility companies, the rate was raised to $1.15. A further raise was granted to a base rate of $1.90 in February, 1921. This rate was reduced to $1.65, effective June 1, 1921; the reduction being acquiesced in by the companies. After citation to show cause why further reduction should not be made, and after full hearing, an order reducing the rate to $1.55 was made, effective January 1, 1922. A valuation of the property used was made by the commission, aggregating $5,250,000; the value of the franchise being excluded, and likewise no allowance made for cost of financing. Estimation of net income was based largely on operations from July 1st to December 1st, under the $1.65 rate, and the rate fixed as just and reasonable was supposed to yield between 7 and 8 per cent. clear on the investment. An injunction against the enforcement of this order is sought now, before any operation under it, on the ground that it is an unconstitutional invasion of the property of the two companies.

[1] 1. The rate attacked was fixed after full hearing, under laws providing therefor. The clear and comprehensive opinion of the Rail-

road Commission recognizes as the applicable principles of law rules which we think are substantially correct, and it evinces a full and conscientious consideration of the evidence. Due process of law has been afforded. The real question is whether the rate so fixed is confiscatory—takes the use of private property for a public purpose without just compensation. As to that we express an independent judgment upon the case presented here, instead of reviewing the judgment of the Railroad Commission for error of law or fact, and the presumption is in favor of the action of the commission.

"We do not sit as a general appellate board of revision for all rates and taxes. We stop with considering whether it clearly appears that the Constitution of the United States has been infringed, together with such collateral questions as may be incidental to our jurisdiction over that one." San Diego Co. v. Jasper, 189 U. S. 439, 446, 23 Sup. Ct. 571, 47 L. Ed. 892.

That question depends here on the value of the private property taken for use, and the compensation probably to be afforded by the rate fixed, as compared with the net returns received in the locality by other investments of capital of comparable security and permanency.

[2] 2. In estimating the value of the property whose use is taken, the commission excluded from consideration the value of the franchises of the gas company, we think correctly. That the charter is a contract upon sufficient consideration, that the franchises granted under it are private property, vendible and taxable as such, cannot be disputed. That they may not be taken from the owners for public purposes, or used adversely to the owners for such purposes, without just compensation, will not be denied. But the fixing of a just and reasonable charge to be made by a public service corporation is neither the taking from it of these franchises, nor the use of them, in the sense of the Constitution. Business which from its nature or from circumstances of monopoly is of public concern is undertaken with the implication that charges made the public therein shall be reasonable. Private property devoted thereto becomes affected with a public interest. Public regulation of the charges is but the enforcement of the duty to make only reasonable charges. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. It may be said that in a franchise granted to do such a business is implied a covenant that the charges shall be just and reasonable, as it has been said that all grants of public franchises are upon the implied condition that they shall be used for the public good, and if they are not used or are misused they may be revoked. New York Electric Lines Co., v. Empire Subway Co., 235 U. S. 179, 35 Sup. Ct. 72, 59 L. Ed. 184, L. R. A. 1918E, 874, Ann. Cas. 1915A, 906.

As pointed out in Munn v. Illinois, this implication has existed from the earliest times, and did not first arise on the passage of regulatory legislation. The fixing of reasonable rates, where unreasonable ones have been charged, does not take the company's franchise nor impair it, but permits and requires its use according to its true original terms. If higher rates have been charged, and profits made greater than the investment should naturally and ordinarily earn, so far from the

franchise having acquired thereby any greater value, it has simply been abused. Regulation is no more than a form of sovereign visitorial power. It does not deprive the owner of his franchise, nor take it or its use from him, but directs it to its proper and only legal use, to wit, the service of the public and the earning for its owners of just and reasonable returns. While used in the public service, like the other property devoted thereto, the franchise is not, like the other property, taken from other service of the owner. It is the public's own contribution to the business, whatever its value therein, and not a thing that either party to the charter could justly think was to become a charge on the public in the fixing of reasonable rates. Otherwise, the more liberal and valuable the franchise granted by the public, the greater would be the burden of rates the public would have to bear.

The absurdity of so regarding it becomes further evident in attempting to value it in rate fixing; for, if it has a value, as is usually stated, because it enables its possessor to earn larger returns than can be attributed to a fair return upon his physical and other intangible property, its value being the capitalization of this excess, a rate could never be reduced. To reduce it would be necessarily to decrease and impair the value of the franchise, because its earning power had been reduced. The owner of a public franchise, for which the grantee paid nothing, except what he invested in the business established under it, is not entitled to have the value of the franchise included in the estimate of his property taken for public use in fixing the reasonable rate to be charged under the franchise. If the franchise were purchased by a payment to the public other than in the investments in the business, such payment, of course, would be an additional investment to be regarded. Nor is the fact that the franchise is taxed as property material. Neither the fact nor the amount of taxation is of any consequence to the owner, because the tax paid is allowed as an expense of business and passed on to the customer.

As being to the contrary of this conclusion two cases having authority are cited—Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463, and Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382. The other cases cited depend upon the former of these, or are a part of the litigation dealt with in the latter. In the Monongahela Case the United States sought to condemn a system of locks and dams of the company, which had been lawfully erected under a franchise to take tolls on the transportation upon the Monongahela river, without paying anything for the franchise, which was confessedly valuable beyond the value of the physical property. Against the contention that the franchise was not taken, but only the property, the court said (148 U. S. 343, 13 Sup. Ct. 633, 37 L. Ed. 463):

"But this franchise goes with the property, and the navigation company, which owns it, is deprived of it. The government takes it away from the company, whatever use it may make of it; and the question of just compensation is not determined by the value to the government which takes, but the value to the individual from whom the property is taken; and when by the taking of the tangible property the owner is actually deprived of the fran-

chise to collect tolls, just compensation requires payment, not merely of the value of the tangible property itself, but also of that of the franchise of which he is deprived."

The distinction between putting the owner of the franchise completely out of the business of using it, and the requiring him by regulation to use it according to its true terms, hardly needs pointing out. This case establishes that a franchise, when taken from the owner, is property that must be compensated for, but does not establish that it is taken when rates are properly regulated.

In the Consolidated Gas Co. Case several companies were consolidated under legislation which expressly recognized as part of the property contributed to the consolidation the value of the several franchises, specifically put at over $7,000,000, and which permitted this value to be represented by capital stock to that amount, which was issued and sold to the public and traded in for 20 years. The public, through its representative, the Legislature, having thus dealt, under these circumstances it was held that this $7,000,000 of value must be included in the property on which a reasonable return was to be allowed, as otherwise this stock could have no income, a result evidently unjust. The court refused to permit any subsequent increase in the value of the franchise to be allowed, which ruling is equivalent to a declaration that franchise value is ordinarily not to be considered, for all values that are involved, it is well settled, must be allowed as of the time of making the rate. The court (212 U. S. on page 48, 29 Sup. Ct. 198 [53 L. Ed. 382]) was careful to say that the decision of the case was based upon its own peculiar facts, and not to be taken as a precedent in the valuation of franchises generally. The lower court, in further dealing with the case, trenchantly asserted the proposition that under ordinary circumstances franchise value should not be estimated in rate making. Consolidated Gas Co., v. Newton (D. C.) 267 Fed. 231, 240. We conclude that complainants are deprived of no constitutional right because their simple franchise to do business, which is all their charter gives them, even if it be perpetual as claimed, has not been valued as property whose use is taken from them.

3. The claim is made that the commission's allowance of $441,629 over and above physical property values as "going concern value" was insufficient, and that $500.000 ought to be added as cost of original financing. We recognize that the cost of financing a modern enterprise is commonly considered a part of the organization expense and chargeable as a capital investment. It is equally true that, when this company was organized, such outlays were more often treated as expense and retired from profits. What expense was actually incurred here, or whether it was carried as investment or retired by charging rates to cover it as expense, we do not know. We do not think it appears that in refusing to recognize this supposed investment, or in fixing the "going concern value," which of necessity is at last a matter of opinion, at a less sum than was claimed and sworn to, the commission violated any constitutional right of the complainants. The same is

true as to their conclusion upon the questions of fact as to proper depreciation and working capital allowance.

[3] 4. In ascertaining the present value of physical properties, though correct rules were announced by the commission, we do not think they were exactly followed. We agree that in a period of changing values a decided tendency to higher or lower may be judicially noticed and considered. as was done in Lincoln Gas Co. v. Lincoln, 250 U. S. at page 268, 39 Sup. Ct. 454, 63 L. Ed. 968, and that a slavish adherence to cost of reproduction, less depreciation, is not required. Rates are not fixed every day, but are designed to have some degree of permanency, and the probabilities of the immediate future, if fairly evident, are part of the situation dealt with. The commission did not allow the appreciation claimed on the investment since 1914, nor did it deduct from the investments of 1919 and 1920, which were nearly $1,000,000, their admitted reproduction loss, but it did allow the appreciation in market price of real estate. On the whole, averaging results, and remembering that values are at last matters of opinion, upon which witnesses and that of ourselves may be no better than that expressed by the commission, we think no constitutional wrong clearly appears.

[4] 5. Losses, or more properly failure to earn 8 per cent. net return on the values since fixed by the commission, are claimed during the years 1917, 1918, 1919, and 1920. During part of this time operations were under the rate voluntarily established by the company; during the rest, under raised rates allowed by the Commission. The claim that the failure to earn a reasonable return, if established, should now be either allowed as capital investment or amortized under this or future rates we cannot allow. To concede this as a right would be to guarantee income, and would raise a correlative duty to account for earnings beyond what were reasonable in the past. No limit could be placed to the period of the inquiry, nor could justice really be done by it to the individual stockholders or consumers actually concerned, for these are constantly changing. A rate established as reasonable, whether by the company or by the commission, is not guaranteed by the commission or the public. Whether it will actually yield more or less than a fair return during its continuance is a risk of the business. We do not deny that it is within the discretion of the commission to consider the experience of the immediate past in fixing a just rate for the future, but we hold that no legal right exists to have disappointments or surprises in results balanced.

6. We find on the whole that it does not clearly appear that a fair return will not be afforded by the rate fixed upon the investment of the complainants. Taking as a basis of reasoning, as did the commission, the experience of the five months, July, August, September, October, and November, during which the $1.65 rate was effective, and excluding June, because its receipts may have been swollen from collections from the $1.90 rate through the prepay meters, we note a regular increase of consumption of about 10,000 M's feet of gas each month. This was due either to increased consumption because the rate had been lowered, or else to the longer nights and colder weather.

If the first cause was operative, it will likely operate further under the new rate. If the latter was, it will operate to make consumption in December, January, and February each equal to that of November. Giving all the chances to the complainants, and putting December as equal only to November, and supposing that a recession will occur in the spring to July's consumption, we find a consumption through December of 621,164 M's feet for six months, or a total of 1,242,328 M's feet for twelve months.

Again, comparing the net profits of the five months, they rise regularly from $34,283.56 in July to $47,697.67 in November. Part of this increase may be due to increased efficiency, consequent on increased production; but most likely it is mostly due to the decreasing price of raw materials and of some labor shown in the record. We might fairly assume that the net profit of the last month is the fair index for the future; but let us, as in the case of consumption, add to the profit shown for the five months a profit equal to that of November as representing December, and we have $251,509.66 for this six months, or $503,019.32 for twelve months. .

[5] But we disagree with the commission in allowing the federal income tax as an expense of business. It is laid with substantial uniformity on all persons and businesses, certainly on all comparable to this. It is assessed on the net profit of business after it is done, and payable the following year. The rate of it has often not been fixed until late in the year affected. The acts laying the tax expressly declare it not to be allowable as an expense of business for the purpose of the tax. It is that part of the profit realized which is demanded by the government in return for its manifold services and protection. Though in some businesses the tax has been added to the price and passed to the consumer, this has not always been done. In banking and other money-lending businesses, usury laws were not relaxed because of the income tax. Usurious interest is not legalized, because the excess is to be paid over as income tax. Holders of government securities above the exempted amounts at so low a rate of return as 4¼ per cent. must pay the tax out of it. To permit law-controlled businesses to pass this tax to the customer, except as it may come to be reflected in generally higher returns obtained by invested capital would be to subvert the policy of the law that imposes it, and, instead of placing them on an equal footing with other investments of capital of similar security and permanency, would be to give them an advantage. It appearing that a net sum of $45,364.00 was distributed as normal federal income tax over the months dealt with above in the accounting of operating expenses and taxes, the above profits estimated for a year should be increased by that sum, making $548,383.-32 as the aggregate result.

This, however, being figured for a $1.65 rate, must have 10 cents per M on the estimated consumption of 1,242,328 M's of gas, or $124,-232.80 deducted, giving $424,150.52 as the probable income per year under the new rate, with no allowance made for increased consumption or reduced cost of production that seem quite probable. This income yields 8 per cent. on $5,381,818, a value in excess of that found

by the commission; a yield of 7 per cent. on $6,059,150, and 6 per cent. on $7,069,176. So low a rate of return as 6 per cent. was upheld in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, when conditions were more stable than now. We think, even were there considerable error in fixing values by the commission, that the rate would not appear to be clearly confiscatory, and subject to injunction before a trial of it.

The preliminary injunction should be refused.