**NARRAGANSETT ELECTRIC CO.**

v.

**Edward F. BURKE et al.**

**No. 79–9–M.P.**

Supreme Court of Rhode Island.

June 5, 1980.

Pasco Gasbarro, Jr., Thomas G. Robinson, Providence, Samuel Huntington, Westborough, Mass., for petitioner.

Dennis J. Roberts, II, Atty. Gen., John R. McDermott, Sp. Asst. Atty. Gen., for respondents.

OPINION

KELLEHER, Justice.

On February 24, 1978, the Narragansett Electric Company (the company) filed with the Public Utilities Commission (the commission) an application for a temporary rate adjustment designed to recoup funds expended in restoring service to customers after the crippling ice storm of January 14, 1978. This storm, described as the most destructive in the company's experience, caused widespread power outages as tree branches encrusted with ice fell across pow-

er lines. In response to the crisis, the company quickly alerted repair units. In addition to its fifty-five regular crews, 194 "outside" line and 153 "outside" tree crews worked continuously for almost a week until total service was restored. The company's plan to recover the costs of this emergency operation, estimated to be $2,500,000 exclusive of normal operational and maintenance expenses, was rejected by the commission, and the company thereupon filed a petition for certiorari with this court.

The commission, acting pursuant to G.L. 1956 (1977 Reenactment) § 39-3-11 (1979 Supp.), had originally suspended the effective date of the proposed temporary adjustment and held a series of hearings from November 20, 1978, to December 13, 1978.[1] Several witnesses testified before the commission, including members of the public opposed to the temporary adjustment and witnesses appearing on behalf of the company. One company witness, Gerald R. Browne, Vice President and Director of Rates for the New England Power Service Company, explained to the commission that the incremental storm expenses could be recovered through a temporary addition of $.00076 to the price of each kilowatt-hour of electricity sold. An alternate method of reimbursement was detailed by the company's vice president, Alfred D. Houston, who testified that the storm costs could be capitalized and amortized over a three-to-five-year period.

In its decision, the commission recognized "the excellent work performed by the employees of the company" and stated that "storm damage is a legitimate operating expense which must be borne by ratepayers and that the [c]ompany has incurred legitimate expenses in this instance." The proposed temporary rate adjustment was denied, however, on the theory that the commission was unable to define the term "extraordinary expenses" given the information provided by the company. It is clear from the commission's order that it also

believed that even if a portion of the storm expense was extraordinary, the prohibition against retroactive ratemaking barred recovery.

■ "Extraordinary expenses" flow from an extraordinary storm. An extraordinary storm is "not necessarily an unprecedented one, but one that happens so rarely that it is unusual and not ordinarily to be expected." *Spitzer v. City of Waterbury*, 113 Conn. 84, 90, 154 A. 157, 160 (1931). This definition accurately describes the unexpected severity of the January 1978 ice storm. In order to determine the extraordinary expenses incurred by a utility in combating such an extraordinary storm, we hold that the everyday operational and maintenance costs, as well as the allowance for typical New England weather used by the commission in calculating rates, must be excluded from total storm expenses.

Turning to the prohibition against retroactive ratemaking, we recognize that the commission justifiably expressed concern over the applicability of this judicially created rule set forth in such decisions as *Bristol County Water Co. v. Harsch*, R.I., 386 A.2d 1103 (1978), and *Narragansett Electric Co. v. Burke*, R.I., 381 A.2d 1358 (1977). No rule should be blindly applied, however, without prior consideration of the underlying policy that originally precipitated its adoption. Such an approach ensures that the application of the rule in a particular instance will not undermine its original purpose. *See Asplin v. Amica Mutual Insurance Co.*, R.I., 394 A.2d 1353 (1978).

The rule against retroactive ratemaking serves two basic functions. Initially, it protects the public by ensuring that present consumers will not be required to pay for past deficits of the company in their future payments. The Supreme Court of New Jersey has expressed this legitimate concern as follows:

---

1. At the time the company filed its proposal for recovery of storm expenses, there was pending before the commission the company's application for a general rate increase. According to

the commission, the order resulting from this earlier application which issued on April 14, 1978, contained no allowance for the incremental expenses of the storm.

"The present practice, as set forth in these cases, is fair to the public utility, for it can act as speedily as it sees fit to move for a correction of inadequate rates, and it is fair to the consumer in safeguarding him from surprise surcharges dating back over years that he had a right to assume were finished business for him and possibly over years when he was not even a consumer." *New Jersey Power & Light Co. v. State Department of Public Utilities, Board of Public Utility Comm'rs*, 15 N.J. 82, 93, 104 A.2d 1, 7 (1954). *See Western Oklahoma Gas & Fuel Co. v. State*, 113 Okl. 126, 239 P. 588 (1925).

The rule also prevents the company from employing future rates as a means of ensuring the investments of its stockholders. *Georgia Ry. & Power Co. v. Railroad Commission of Georgia*, 278 F. 242 (D.C.Ga. 1922). If a utility's income were guaranteed, the company would lose all incentive to operate in an efficient, cost-effective manner, thereby leading to higher operating costs and eventual rate increases.

■ The application of the rule against retroactive ratemaking to prevent the company from recovering the extraordinary cost of the ice storm would serve neither of the policies expressed above. Because of the unpredictable and severe nature of the storm, it is unlikely that company officials, in planning their operational expenses, could take into account the cost of repairing the widespread damage that occurred on January 14, 1978. The existing rates, moreover, as the commission indicated in its decision, were "not in any fashion [based on] the extraordinary expenses of restoration of service after the ice storm." Since the company incurred highly extraordinary expenses not covered by existing rates in combating this freakish storm, it is difficult to perceive how the future efficiency of the utility would be furthered by the application of the rule in this instance.

We have also noted that the rule serves to protect present customers from paying for a utility's past operating deficits. This aspect of the rule must be weighed against the interest of providing immediate service to customers when a destructive, unexpected storm occurs. On such an occasion the public interest in quickly restoring heat and electricity to the homes of customers must prevail.

The Evening Bulletin, in its editorial comment on the ice storm entitled "Rhode Island on ice," described the repair crews as the storm's heroes who

"knitted the power lines—our community umbilicals—back together. Deftly wielding chain saws, bouncing aloft in cold buckets among tangled limbs and lines, the linemen did an impressive job of patching things up under miserable conditions. Nature smote us quite a blow, but we are back with our modern comforts, reassured. Until the next time." Jan. 17, 1978.

The next time a storm of this magnitude occurs, the company would have no incentive to hire outside line and tree crews to restore service efficiently and swiftly to customers if no reimbursement for extraordinary expenses would be forthcoming. Thus, application of the rule to expenses related to such an emergency situation so inextricably related to the public health and safety would serve to thwart the goal of effective customer service.

The plethora of cases from other jurisdictions permitting a utility to recover the extraordinary costs associated with an unusually severe storm indicate that the rule against retroactive ratemaking does not come into play in such instances. *Re United Illuminating Co.*, 7 P.U.R.4th 417 (Conn. P.U.C.1974); *Re Diamond State Telephone Co.*, 28 P.U.R.3d 121 (Del.P.S.C.1959); *Re Southern Bell Telephone & Telegraph Co.*, 66 P.U.R.3d 1 (Fla.P.S.C.1966); *Re Kansas Power & Light Co.*, 8 P.U.R.4th 337 (Kan.S.C.C.1975); *Re Baltimore Gas & Electric Co.*, 25 P.U.R.3d 91 (Md.P.S.C.1958); *Boston Edison Co.* D.P.U. 19300 (Feb. 28, 1977); *Re Detroit Edison Co.*, 20 P.U.R.4th 1 (Mich.P.S.C.1977); *Re Southwestern Bell Telephone Co.*, 92 P.U.R.N.S. 481 (Mo.P.S.C.1952); *Re Chrisp's Telephone Co.*, 65 P.U.R.3d 317 (Neb.S.R.C.1966); *Re Long Beach Water*

*Co.*, 53 P.U.R.3d 495 (N.J.P.U.C.1964); *Re Long Island Lighting Co.*, 9 P.U.R.4th 21 (N.Y.P.S.C.1975); *Pennsylvania Public Utility Commission v. Pennsylvania Electric Co.*, 25 P.U.R.4th 342 (Penn.P.U.C.1978).

We would emphasize, however, that the exception to the rule expressed herein is inapplicable to expenses incurred in connection with New England's usually capricious winter climate. A utility company may recover by whatever method the commission deems appropriate only the unusual and nonrecurring expenses related to such extraordinary occurrences as the freakish ice storm of the winter of 1978.

The petition for certiorari is granted, the order of the commission is quashed, and the record certified to this court is ordered returned to the commission with our decision endorsed thereon.

DORIS and MURRAY, JJ., did not participate.