PROVIDENCE GAS COMPANY

v.

Edward F. BURKE, Administrator Division of Public Utilities and Carriers.

Dennis J. ROBERTS II, Attorney General

v.

PROVIDENCE GAS COMPANY.

Nos. 82–340–M.P., 82–341–M.P.

Supreme Court of Rhode Island.

Feb. 21, 1984.

**194**

Dennis J. Roberts II, Atty. Gen., John R. McDermott, Sp. Asst. Atty. Gen., for petitioner.

Michael P. DeFanti, Hinckley & Allen, Robert J. Ferranty, Providence, for respondent.

## OPINION

KELLEHER, Justice.

On September 28, 1981, the Providence Gas Company (company) filed with the Public Utilities Commission (commission) a schedule of proposed rate increases designed to produce an additional $12,821,714 in revenues. The commission, under the authority of G.L.1956 (1977 Reenactment) § 39–3–11, as amended by P.L.1977, ch. 236, § 2, suspended the proposed effective date of the new schedules.

Section 39–3–11 allows the suspension of the effective date for an initial five-month period and subsequent three-month period if additional time is needed. The purpose of these suspension periods is to allow hearings on the proposed increase through which the commission and the public may become better informed with respect to the proposed rate increase.

This statutory purpose worked as well in practice as in theory in the instant case. Over twenty-five issues were presented to the commission through the direct testimony of seven witnesses. The Division of Public Utilities and Carriers (division) presented three witnesses who disputed the claims of the company. These hearings were all public and were held during the months of January, February, and March of 1982. Later, the commission conducted three separate night hearings for the express purpose of soliciting comments from the general public about the company's proposal.

On June 23, 1982, the commission issued a report and order rejecting the proposed increase and requiring the company to file a new tariff that would generate revenues in the amount of $9,963,992. The new tariff was filed by the company one week later, on June 30. On July 9, 1982, the division sought to amend the approved rate order, alleging that clerical errors made the total amount of the order incorrect. The company and the commission assented to one of these errors, but the rest were rejected by the commission, and on July 16 the company was requested to file new orders consistent with this decision.

The new tariff, designed to produce additional revenues in the amount of $9,551,769, was filed later, on July 16. It was accepted by the commission in an order providing that the tariff's new rates would become effective on July 20, 1982. This order provided that the company could collect these rates for gas consumed between June 23 and July 20.

This appeal was filed by the Attorney General July 21, and on July 22, a cross-appeal was filed by the company. There are six issues raised, each of which we shall address. These include the limits under which the commission operates with respect to the statutory suspension period; the propriety of two alleged retroactive rate increases; the competency of the evi-

dence relied on by the commission; an alleged failure to correct clerical errors; and whether the Attorney General's petition for writ of certiorari was timely filed.

We first turn to the question of whether the Attorney General's petition for certiorari from the amended report and order of the Public Utilities Commission of July 16 was filed within the statutory period. The statute allowing such appeals is § 39-5-1. This statute provides that "[a]ny person aggrieved by a decision or order of the commission may, within seven (7) days from the date of such decision or order, petition the [S]upreme [C]ourt for a writ of certiorari to review the legality and reasonableness of said decision or order."

■ The order that the Attorney General now challenges was issued on July 16, 1982. The certiorari petition was filed on July 21, clearly within the seven-day period. However, the company asserts that since a substantial portion of the Attorney General's appeal concerns the June 23 order, the appeal as it relates to those issues is untimely. We believe that there may be merit in this contention, but, because of the mathematical deficiencies that appeared subsequent to the issuance of the June 23 report and order and, more importantly, because of the substantial public interest involved in this type of controversy, we shall consider the July 21 petition as seeking the issuance by this court of a common-law writ of certiorari, having in mind that the Legislature cannot divest this court of its power to review decisions of subordinate tribunals who exercise a judicial or quasi-judicial function. *State v. DeLomba*, 117 R.I. 673, 370 A.2d 1273 (1977); *Simmons v. Town Council of Coventry*, 112 R.I. 522, 312 A.2d 725 (1973); *Smith v. Estate of Catterall*, 107 R.I. 729, 271 A.2d 300 (1970). Consequently, we will review all of the issues raised by the Attorney General.

The company takes the position that the commission does not have the authority to defer the active date of the new tariff beyond the eight-month statutory suspension period set forth in § 39-3-11. It argues that since the proposed rates were filed on September 28, 1981, if the commission did not put substitute rates into effect by June 27, 1982, the proposed rates would then immediately become effective.

In order to properly understand this issue, we must look at the statute itself. Section 39-3-11 provides that "[n]o change shall be made in the rates, tolls and charges which have been filed and published by any public utility * * * except after thirty (30) days' notice * * *." During this thirty-day period, the commission is required to "make investigation as to the propriety of such proposed change or changes." Following notice of this investigation, the commission has the power under this statute "to suspend the taking effect of such change or changes pending the decision thereof, but not for a longer period than five (5) months beyond the time when such change or changes would otherwise take effect * * *." At the expiration of this period, the commission has the power "further [to] suspend the taking effect of such change or changes pending the decision thereon, but not for a longer period than three (3) months beyond the expiration of the first mentioned five (5) month period." Both parties agree that the commission regularly suspends the effective date of rates for the entire eight-month period.

■ The company filed its proposed schedule of rates on September 28, 1981, to become effective on October 28, 1981. The commission then suspended the effective date of the proposed increases until June 27, 1982, by the entry of two suspension orders, the first for five months and the second for three months. The report and order rejecting the company's application was filed on June 23, 1982. It is our belief that once the commission issued its order of June 23 directing the company to come forward with a revised tariff designed to bring in revenue in excess of $9 million, the commission had discharged its obligation

under the statute and the suspension provisions became inoperative.

■ This decision flows from the words of the statute, which applies only to proposed rates. The mandate of § 39–3–11 is that the commission not take longer than eight months to decide on the original filed rates. The statute does not apply to substitute rates offered after the proposed rates have been rejected.

We find ourselves in accord with *Lambertville Water Co. v. New Jersey Board of Public Utility Commissioners*, 79 N.J. 449, 401 A.2d 211 (1979). In *Lambertville* the New Jersey Supreme Court construed the meaning of its statute, which provided for two four-month suspension periods. That court held that this statute "has no bearing on the effective date of a substituted rate increase fashioned by the Board when it rejects that sought by the utility." *Id.* at 455, 401 A.2d at 214.

In *Mechanic Falls Water Co. v. Public Utilities Commission*, 381 A.2d 1080 (Me. 1977), the Maine Supreme Court reached a similar conclusion. It also encountered an argument by a utility company that since the maximum suspension period is eight months, substituted rates must be in effect prior to the termination of that suspension period.

The court held that "[t]he flaw in its argument is that the maximum suspension period concerns the length of time a *proposed rate schedule* can be suspended. It simply has no bearing on when a *substituted rate schedule* becomes effective." *Id.* at 1108.

We agree with these sentiments. Our statute, § 39–3–11, provides only that "[w]ithin ninety (90) days after the completion of any such hearing, the commission shall make such order in reference to any proposed rate, toll or charge as may be proper." The commission, in rejecting the original September 28, 1981 filing, complied with the statute through its June 23 order. There is no requirement that a rate become effective within the eight-month period—merely that an order issue.

We now turn to the issues raised by the Attorney General in his appeal. The Attorney General claims that the commission, by its action, has permitted the company to engage in retroactive ratemaking by permitting the company to recover the new rates for gas consumed prior to the date of the commission's order of July 16.

As part of the July 16 decision and order of the commission, the company was permitted to collect, beginning July 20, 1982, the new rates for gas consumed on and after June 23, 1982. The Attorney General contends that by permitting this method of collection, the commission is engaging in retroactive ratemaking.

As an initial proposition, we must first point out that by definition retroactive ratemaking has no application to this issue. We have said in the past that the rule against retroactive ratemaking serves two functions. "Initially, it protects the public by ensuring that present consumers will not be required to pay for past deficits of the company in their future payments. * * The rule also prevents the company from employing future rates as a means of ensuring the investments of its stockholders." *Narragansett Electric Co. v. Burke*, R.I., 415 A.2d 177, 178–79 (1980). In short, the prohibition against retroactive ratemaking is based upon the rationale that future rates may not be designed to recoup past losses. *New England Telephone and Telegraph Co. v. Public Utilities Commission*, 116 R.I. 356, 388, 358 A.2d 1, 20 (1976).

What the Attorney General complains of is that the effect of this particular order is contrary to the statutory scheme and theory of our public utilities law. This theory may be deduced from a consideration of various aspects of title 39. The declaration of policy of title 39, § 39–1–1, is that since public utilities are affected with the public interest, the state must provide that rates be just and reasonable.

Section 39–3–10 provides that "[e]very public utility shall file with the public utility administrator within a time to be fixed by the administrator, schedules which shall be open to public inspection, showing all rates, tolls and charges which it has established and which are in force at the time for any service performed by it within the state * * *." Finally, as we noted earlier, § 39–3–11 provides that "[n]o change shall be made in the rates, tolls and charges which have been filed and published by any public utility in compliance with the requirements of § 39–3–10, except after thirty (30) days' notice to the commission and to the public published as aforesaid * * *."

These legislative declarations, taken together, indicate a concern that the public should have notice before any rate increase will take effect. Presumably, the thirty days' notice will give current gas consumers the opportunity to consider the rate increase while deciding whether to use natural gas or to switch to another energy form.

Therefore, the question concerns when, under the specific provisions of § 39–3–11, the new rates "take effect," that is, are the new rates applied to future consumption only or may they be applied to gas consumed prior to the date of the order of July 20? [1]

■ One of the central principles of rate-making is that rates must be prospective. It is well settled that rates are exclusively prospective in nature and that future rates may not be designed to recoup past losses. *Narragansett Electric Co. v. Burke*, R.I., 404 A.2d 821, 827 (1979).

Since the issue of when an approved rate takes effect is novel in Rhode Island, we look to the disposition other courts have made when confronted with the question.

The Vermont Public Service Board made a similar determination in *Re Vermont Electric Cooperative, Inc.*, 36 P.U.R. 4th 405 (1980). The board noted initially that it had been the practice to apply changed rates as of the billing date. However, this was found to violate the intent of 30 VSA §§ 225–227 which provide, as does our § 39–3–11, that the rates be filed thirty days prior to the date on which the rates are to become effective. This thirty-day period gives the public notice of the change in rates. "One significant effect of a change in rates should be (and usually is) a change in usage patterns by customers. The customers should have knowledge of a change in order to make decisions regarding their usage before the change applies to kilowatt-hours used by them." *Re Vermont Electric Cooperative, Inc.*, 36 P.U.R. 4th at 406.

A similar position was expressed by the Florida Supreme Court in *Gulf Power Co. v. Cresse*, 410 So.2d 492, 493 (Fla.1982), where it upheld a decision of the Florida Public Service Commission which directed the utility to bill at the new rates for meter readings taken 30 days after the Florida commission had authorized an increase in the utility's rates and charges.

■ We subscribe to the Florida rationale that requires that bills reflect services rendered. Otherwise, the consumer would be billed for energy consumed prior to the commission's action at a rate not in effect until after its decision. Consequently, the increased rates approved here should be applied to bills based on meter readings taken on and after July 23, 1982, 30 days after the June 23 order.

■ In permitting the company to recoup the 1980 property-tax surcharge imposed by the city of Providence, the commission also subjected itself to the Attorney General's claim that such action constituted retroactive ratemaking.

1. This issue indicates the difference in the rate-making and the billing processes. Although as a general rule each of the factors that contribute to the making of a rate is historical, they are all applied in a prospective fashion. The billing process is retroactive in that it seeks payment for gas consumed. We must necessarily consider this fact of the billing process in answering this question.

We have previously discussed the prohibition against such an activity. Nevertheless, we are aware that there may be exceptions to this prohibition. Such an exception was applied recently in *Narragansett Electric Co. v. Burke*, R.I., 415 A.2d 177 (1980). There we considered whether the "extraordinary expenses" flowing from a devastating ice storm should be recouped by the electric company. *Id.* at 179. In *Narragansett Electric Co. v. Burke* we held that the nearly $2,500,000 expended by the company was a one-time expense, not part of normal operating expenses. *Id.*

In rejecting the proposition that the expenses for the storm were "retroactive ratemaking," we first noted that "[n]o rule should be blindly applied, however, without prior consideration of the underlying policy that originally precipitated its adoption." *Id.* at 178. We held that the underlying policies of the rule against retroactive ratemaking were not affected by this decision. "Because of the unpredictable and severe nature of the storm, it is unlikely that company officials, in planning their operational expenses, could take into account the cost of repairing the widespread damage that occurred on January 14, 1978." *Id.* at 179.

The tax at issue here, an $11.43 per $1,000 supplement to the 1980 taxes, which was demanded in 1981, was equally unpredictable. The company, in establishing its rates for 1981, necessarily had to predict the tax rate for 1980. However, it would have been impossible for them to have predicted the *supplemental* tax surcharge assessed by the city.

This expense itself was extraordinary. Prior to the imposition of this tax, the city of Providence found itself in dire financial straits. Banks, upon whom the municipality relies for funding through loans, refused to provide further loans until the city took measures indicative of its credit worthiness. The additional surcharge for 1980, and an equal increase in 1981, was necessary in order for the city to show its good faith.

It is clear that the company is faced with a one-time surcharge and is seeking recovery not for an improperly anticipated tax increase but for a retroactive charge that would be impossible to foresee.

This decision is in accord with the practical considerations involved in ratemaking. We can only repeat the sentiments expressed in *Roberts v. Narragansett Electric Co.*, 470 A.2d 215 at 217 (R.I.1984): "The specter of retroactive ratemaking must not be viewed as a talismanic inhibition against the application of principles based upon equity and common sense."

The Attorney General claims that the commission's decision granting the company an erosion allowance (based on the estimated inflation rate) was improper in that the commission relied on incompetent evidence in reaching its decision.

An erosion adjustment estimates the impact inflation will have on the costs and expenses of the company and is reflected in the tariffs issued by the commission. Rates are generally based on a historical test year. Revenues are allowed to cover expenses for the future, based on the data from the prior period. Revenues are allowed for "known and measureable" charges. Since the rate of inflation is not "known and measureable," it is necessarily an estimation.

In order to determine the adjustment for this rate hearing, the company presented the testimony of Dr. James J. O'Leary, the former vice chairman of the board and the current economic consultant of the United States Trust Company. His prediction was that the impact of inflation on business would be in the range of 7 to 8 percent. The commission allowed an erosion adjustment of 6½ percent.

The Attorney General argues that Dr. O'Leary based his prediction on the effect inflation has on the economy as a whole instead of specifically focusing on the Providence Gas Company. It is argued that this aspect of testimony indicates the com-

mission's decision is based upon mere speculation.

This court does not engage in factfinding with respect to decisions of the Public Utilities Commission. "That is the commission's role; ours is to determine whether the commission's decision and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached." *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 277, 302 A.2d 757, 762 (1973).

■ In passing upon the question of whether the result reached is based upon reasonable evidence, we do not consider the formulas used in the ratemaking process. We merely decide whether the end result is just and reasonable. *Id.* at 280, 302 A.2d at 764.

Estimation of the inflation rate is, by definition, a predictive science. No one can be expected to state correctly, with pinpoint accuracy, the exact rate of inflation. Therefore, reasonable estimates of what tomorrow may bring may also be relied on.

■ Applying this guideline to this issue, we see no reason to overturn the commission's decision. Doctor O'Leary appears to be an extremely knowledgeable and well-qualified economist whose very professional function is prediction of the economic future. However, the Attorney General stresses that his opinion did not employ an analysis of the Providence Gas Company specifically.

Yet there was no evidence given to the commission contradicting the testimony of Dr. O'Leary. There was no evidence that the peculiarities of the company would skew the inflation rate as applied to it.

Since the commission was not aware of any possible differences, it was justified in the erosion allowance it awarded. Under the standard of review of *Smith*, this decision should be upheld.

■ After the commission issued its order on July 23, 1980, the division and the Attorney General discovered that the report and order contained a number of clerical errors. Both parties requested that the commission make the appropriate corrections pursuant to Rule 1.26(a) of the commission's Rules of Practice and Procedure. These corrections were considered on July 14, 1982; and on July 16 the commission issued an order recalculating one of the four issues requested by the parties.

A Rule 1.26 motion under the commission's Rules of Practice and Procedure is similar to Rule 60(a) of the Superior Court Rules of Civil Procedure which serves as a means to correct clerical or computational errors of a commission without the necessity of a full hearing. Neither rule should be used to reconsider substantive matters, but only those clerical mistakes resulting from oversight or omission. *DiBello v. St. Jean*, 106 R.I. 704, 708–09, 262 A.2d 824, 826 (1970).

Some of the "clerical errors" concerned such items as capital for works in progress, an item not presented during the hearings; depreciation allowance; and certain adjustments relative to cash working capital. It is obvious that the division was seeking to invoke Rule 1.26 as a rectifying mechanism for both substantive and clerical matters. This was an improper use of the rule. We cannot fault the commission for its disagreement with the Attorney General about what issues were properly within the reach of Rule 1.26.

The petition for certiorari is denied in part and granted in part, the company's cross-petition is denied, and the record is remanded to the commission for further proceedings in accordance with this opinion.