520 So.2d 1355 (1987)
STATE of Mississippi, ex rel. Edwin Lloyd PITTMAN, Attorney General, and Mississippi Legal Services Coalition, and Southeast Mississippi Legal Services Corp.
v.
MISSISSIPPI PUBLIC SERVICE COMMISSION and Mississippi Power Company.
Nos. 57104, 57123.
Supreme Court of Mississippi.
December 2, 1987.
Rehearing Denied March 16, 1988.
*1356 Edwin Lloyd Pittman, Atty. Gen. by Frank Spencer and W. Glenn Watts, Sp. Asst. Attys. Gen., Jackson, Jeremy Eisler and John Jopling, Hattiesburg, for appellants.
James S. Eaton and Ben H. Stone, Eaton, Cottrell, Galloway, Lang & Stone, Gulfport, Richard W. Wise and Dennis W. Miller, Jackson, for appellee.
En Banc.
SULLIVAN, Justice, for the Court:
In September, 1985, the Mississippi Power Company (the Company) interrupted service to twenty-three (23) counties in Southeast Mississippi when Hurricane "Elena" converged on the Gulf Coast area. On October 28, 1985, the Company filed with the Public Service Commission (the Commission) a "notice of change in rates" rather than "a notice of intent to change rates" because, contends the Company, its filing of $16,063,986.00 did not involve any substantial revenue adjustment or constitute a major change. The Company contends that its rules and regulations do not require it to file that data otherwise required by Mississippi Code Annotated, § 77-3-37(2) (Supp. 1986). The purpose of the rate increase was to recover losses allegedly resulting from Hurricane Elena.
On November 6, 1985, the Attorney General filed notice of intervention to protect the interest of the ratepayers and on November 25, 1986, the Mississippi Legal Services Coalition (MLSC) and Southeast Mississippi Legal Services Corporation (SMLSC) intervened for affected ratepaying clients and moved to dismiss the rate increase. Nothing was ever filed in opposition to these motions nor did the Commission hold a hearing on them. On November 27, 1985, the Commission gave notice to the public stating that the notice filed by the Company was returnable to the January 7, 1986, term. The Commission's notice stated that "If protest, answer or other appropriate pleading is on file in response to the application, the Commission will fix a date during the term for the trial of this cause."
*1357 Subsequent to preliminary discovery, but prior to any hearing, the Commission granted a temporary increase of $9,994,135.00 by order on December 20, 1985. This amount was to be amortized over a period not to exceed nineteen (19) months. This increase excluded certain labor and transportation costs claimed by the Company which the Commission found would have been expended any way. Also, the Commission disallowed fuel charges for the period of time the Company was in fact not in service. Also deducted from the estimated damages were the insurance proceeds available to the Company which it neglected to deduct. The Commission further approved a permanent $536,135.00 increase in the Company's annual jurisdictional contribution to its storm damage reserve account.
On December 24, 1985, the Commission issued an amended order which established a ceiling of $10,928,400.00 on the total permissible accrual to the utility's storm damage reserve.
The Commission's final order states that the Company filed for "a routine change in rates" under sub-sections (1) and (10) of Mississippi Code Annotated, § 77-3-37 (Supp. 1986), which gave the Commission authority to grant a rate increase within thirty (30) days without a hearing since "no major revenue changes were involved." The Commission allowed the Company to recover past "storm related expenses" of $8,793,422.00 and $1,200,713.00 to recoup profits "lost" because the utility was unable to sell electricity during and immediately after Hurricane Elena.
On January 17, 1986, the Attorney General petitioned the Commission for a rehearing on the grounds that the Commission had exceeded its authority in granting a rate increase to a utility that had filed no notice of intent, had not shown any good cause why a hearing should not be held, nor why statutorily mandated documentation should not be required. The Attorney General further argued that there was no precedent for granting a rate increase to recover lost revenues for power not even delivered as a service to ratepayers. The petition further suggests that the increase in storm damage reserves was based upon inadequate and uncorroborated allegations by the Company. SMLSC and MLSC also sought a rehearing, requesting reconsideration and clarification of the Commission's order pursuant to Mississippi Code Annotated, § 77-3-65 (Supp. 1986).
On February 14, 1986, the rehearing was denied by the Commission. Commissioner Snyder filed a separate dissent claiming that "... a public hearing should have been held." In the order denying the rehearing, the Commission abandoned its prior conclusion that the Company had filed a "routine rate increase" and determined that the filing could best be handled in a "miscellaneous proceeding" under the authority of Mississippi Code Annotated, § 77-3-47 (Supp. 1985).

I.

WAS THE PUBLIC SERVICE COMMISSION ORDER CONTRARY TO OR IN EXCESS OF, ITS STATUTORY AUTHORITY?
The Mississippi Public Service Commission is accorded its power and jurisdiction under Mississippi Code Annotated, § 77-3-5 (1972), thus having exclusive authority over retail rates for public utilities in Mississippi. State of Mississippi, ex rel Edwin Lloyd Pittman, Attorney General, et al v. Mississippi Public Service Commission, 506 So.2d 978 (Miss. 1987); Capital Electric Power Association v. Mississippi Power & Light Co., 216 So.2d 428, 430 (Miss. 1968). The Commission's authority is also derived from Mississippi Code Annotated, § 77-3-45 (Supp. 1986), which was adopted as part of the Public Utility Act of 1983, authorizing the Commission to develop reasonable rules and regulations, therefore enabling it to carry out the provisions of the Act.
While broad authority and discretion has been promulgated in favor of the Commission that power is not unbridled and the rules and regulations which it has promulgated to aid in the fulfillment of its duties under the chapter must not be utilized *1358 in an arbitrary or capricious manner, "It is clear under Mississippi law that an administrative agency cannot exceed the scope of authority which was granted to it by the legislature. (citations omitted)." Mississippi Board of Nursing v. Belk, 481 So.2d 826, 829 (Miss. 1985). Further, the Commission's authority to interpret the statutes under which it operates may not supersede the requirements thereof, nor may it conflict with pertinent rules of law. Capital Electric Power Association v. Mississippi Power & Light Co., 240 Miss. 139, 153, 125 So.2d 739, 744 (1961).
The Commission and the Company vehemently argue that no evidentiary hearing was needed or required by statute in the instant circumstance. Indeed, it seems that this question has never before presented itself before this Court and apparently, although the appellees argue otherwise, if in the interest of the ratepayers a rate increase is contested the Commission has heretofore granted a hearing.
This necessarily leads to a review of the language of the statute relied upon by all parties while keeping in mind that "an administrative agency cannot be vested with arbitrary and uncontrolled discretion." Howell v. State, 300 So.2d 774, 779 (Miss. 1974). Further, the Commission's rulings may not supersede the requirements of the statute. Capital Electric, supra. The Company originally maintained that its filing was for a routine rate change made pursuant to Section 77-3-37(1), therefore, not subjecting it to the listed standard filing requirements of Section 77-3-37(2). The Commission found that the rate increase was neither a routine one nor a major one [as defined in Section 77-3-37(10)].
The Commission, in its Order denying a rehearing, explains in detail why it perceives its actions appropriate for resolution of this matter, referring to the instant rate proceeding as a "miscellaneous" one. In so finding the Commission relied upon what it refers to as the "catch all" provision of Section 77-3-47, Mississippi Code Annotated (Supp. 1986), entitled "Hearings by Commission." The pertinent paragraph reads:
The Commission may, in addition to the hearings specifically provided for by this chapter, conduct such other hearings as may be required in the administration of the powers and duties conferred upon it by this title.
The Commission cites as an example of such a proceeding those authorized by Mississippi Code Annotated, Section 77-3-41 (Supp. 1986), which provides for emergency, temporary rate changes. The second paragraph of that code section reads as follows:
The commission shall have power, when deemed by it necessary to prevent injury to the business or interest of the people or any public utility of this state in case of any emergency, to permit any public utility to alter, amend or suspend temporarily any existing rates, schedules and orders relating to or affecting any public utility or part of any public utility in this state except as provided in section 77-3-42.
This explanation somewhat begs the question and the attorney general's office should at least have an opportunity to cross-examine the Company prior to the implementation of such a rate increase. Further, a great deal of the rate increase is permanent, subject to a CAP, rather than temporary.
Mississippi Code Annotated, Section 77-3-37(1), (2), (5), (9), and (10), (Supp. 1985), as well as the Commission's own rules, which track the statute, are relied upon in support of the attorney general's contention that proper documentation was not filed by the Company. Those sections, in pertinent part, are as follows:
(1) No public utility shall make any change in any rate which has been duly established under this chapter, except as provided in this chapter. A public utility seeking a change in any rate or rates shall file with the secretary of the commission a notice of intent to change rates. Routine changes in rates and schedules that do not involve any substantial revenue adjustment may go into effect after thirty (30) days' notice *1359 to the commission or after such shorter period of notice as the commission, for good cause shown, may allow. In all other cases, the notice of intent shall contain a statement of the changes proposed to be made in the rates then in force, the new level of revenues sought, the reasons for the proposed changes and the date proposed for such changes to become effective, which date shall not be less than thirty (30) days after the date of filing. The proposed changes may be shown by filing new schedules, by plainly indicating the changes upon schedules filed and in force at the time and kept open to public inspection or by such other manner as will clearly indicate the rates to be changed and the rates proposed. All direct testimony, exhibits and other information which any utility will rely upon in support of the proposed changes shall be filed concurrently with the filing of the notice of intent. Data, documentation and exhibits shall comply with the standard requirement list established by the commission, and such other data as the commission shall request shall be supplied by such utility.
(2) The Commission shall establish by rule and regulation a standard requirement list of documentation to be filed with or to be included in every notice of intent, which standard requirement list in each case shall include: (See statute for list).
* * * * * *
(5) The notice of intent shall state the test period adopted by the public utility in support of its proposed rate changes, which may be a twelve-month period beginning with the proposed effective date of the rates proposed in the notice. For the purpose of expediting the regulatory process, all public utilities shall keep the commission, through the public utilities staff, advised of its plans or needs for future requests for major rate changes.
(9) The public utilities staff and all intervenors or protestants shall file all direct testimony, exhibits and other information which is to be relied upon regarding the proposed changes within sixty (60) days from the filing of such notice of intent. Within five (5) days after the staff, intervenors or protestants have filed direct testimony, exhibits and other information, each shall serve copies of the documentation on all parties of record and shall file a certificate of service with the commission.
(10) The commission, for good cause shown, may, except in the case of major changes, allow changes in rates to take effect at the end of thirty (30) days from the date of the filing and the notice of intent, or on the effective date set out in said notice, without requiring any further proceedings, under such conditions as it may prescribe. All such changes shall be immediately indicated by such public utility upon its schedules. "Major changes" shall mean (a) an increase in rates which would increase the annual aggregate revenues of such public utility more than the greater of One Hundred Thousand Dollars ($100,000.00) or two percent (2%), but shall not include changes in rates allowed to go into effect by the commission or made by the public utility pursuant to an order of the commission after hearings held upon notice to the public, or (b) a change in the rate design which has a significant impact on a class or classes of ratepayers. (Emphasis Added).
These filings are required by statute in all but routine rate increases not requiring substantial revenue adjustments. Therefore, this documentation should have been required by the Commission. After all the Commission itself stated that this was not a routine rate increase.
Further controversy surrounds the interpretation of Mississippi Code Annotated, § 77-3-37(4) (Supp. 1986), which provides:
(4) Unless the commission, upon application by a utility and for good cause shown, shall enter an order waiving one or more of the following requirements, then whenever a public utility files a notice of intent wherein an increase in the level of revenues in the amount of at least Fifteen Million Dollars ($15,000.000.00) is sought, the said standard *1360 requirement list of documentation shall include:

(a) Guidelines or directives as to the public utility's presentation provided by a controlling affiliate, parent or holding company;
(b) Marginal cost date;
(c) Alternate rate design;
(d) Conservation effectiveness;
(e) A properly prepared, complete, detailed lead-lag study for the test year for the total company, Mississippi retail, other retail jurisdictions, and Federal Energy Regulatory Commission wholesale rates in support of the public utility's total working capital requirement contained therein, including all working papers in support thereof;
(f) Direct testimony proposed to be offered at a hearing. (Emphasis added).
The Commission understands the statute to mean a $15,000,000.00 increase in annual revenues as any other interpretation would be nonsensical since any increase, if considered over a sufficient period of time, would eventually amount to over $15,000,000.00. The Commission's logic is ill founded in that there are certainly situations in which it may implement a temporary emergency rate increase which would not amount to $15,000,000.00 annually or otherwise. The Commission does admit that proceedings under this section certainly require a public hearing (abbreviated or otherwise). It is the Commission's position that since the rate increase will be slightly under $7,000,000.00 annually a hearing was not required.
It is the position of the attorney general that had the legislature meant annually, they certainly would have promulgated the statute to say that. Therefore, since the rate increase (initially to remain in effect for a period not to exceed 19 months) allows for an annual retail jurisdictional contribution to storm damage reserve of $536,175.00 for a total annual jurisdiction retail contribution of $1,286,820.00 and allows for amortization of the total expenses in loss revenues in the sum of $9,994,135.00 thereafter ordering the reduction of the increase to a level enabling the Company to recover a permanent $536,175.00 increase to its annual jurisdictional retail contribution to storm damage reserve upon which is placed a $10,928,400.00 CAP, this obviously amounts to a sum greater than $15,000,000.00.
An evidentiary hearing must be granted on this matter in order to allow the representative of the State's interest to confront and cross-examine the witnesses for the Company. This conclusion is based on a review of Section 77-3-37 and the lack of authority of the Commission to create the alleged statutorily implied category of rate changes that are larger than "routine" but less than "major." Since the statute speaks of only "routine" and "major" rate changes and since admittedly the instant rate change is not "routine" it is certainly questionable whether the Commission may create an implied category entitled "miscellaneous."

II.

WHETHER THE PUBLIC SERVICE COMMISSION'S ORDER CONSTITUTED RETROACTIVE RATEMAKING AND IS THEREFORE CONTRARY TO LAW?

A.

STORM DAMAGE EXPENSES
As a general rule losses incurred by a utility because an existing rate is inadequate may not be recovered by excessive rates in the future. Nichols & Welch, Ruling Principles of Utility Regulation, Supp. A, pp. 318-319 (1964). Today however, many jurisdictions recognize a general exception to the blind application of the rule against retroactive ratemaking. Apparently, the exception to the rule is based upon the premise that no rule should work to undermine its original purpose.
The prohibition of retroactive ratemaking tends two basic functions. "Initially, it protects the public by ensuring that present consumers will not be required to pay for past deficits of the company in their future payments." Narragansett Elec. Co. v. Burke, 415 A.2d 177, 178-79 *1361 (R.I. 1980). This effectively protects the consumer from surprise surcharges from years back due to negligence or mismanagement on the part of the Company. Additionally, the rule prevents the utility "from employing future rates as a means of ensuring the investments of its stockholders." Id. (citing, Georgia Rye & Power Co. v. Railroad Commission of Georgia, 278 F. 242 (D.C.Ga. 1922). If a utility company were guaranteed a certain return, it would forego all incentive toward an efficient, cost effective operation, thus resulting in even higher operating costs and frequent rate increases.
The Mississippi case addressing this rule and upon which the appellants rely is Mississippi Public Service Commission v. Home Tel. Co., 236 Miss. 444, 110 So.2d 618 (1959). Although the rule is indeed cited therein, appellants' reliance thereon is misplaced. The situation at issue was one in which the Company attempted to regain, out of its operating expenses, $25,454.95 in past losses incurred by it because it waited too long to put its proposed rates in effect under bond. This Court disallowed the Company's proposal citing the rule against retroactive ratemaking. Additionally the court disallowed the company's loss on its abandoned, obsolete telephone plant proposed to be amortized from operating expenses over a five year period. See also, F.P.C. v. Tennessee Gas Transmission Co., 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962).
A distinction exists between the aforementioned situations and the instant case. The exception to the rule against retroactive ratemaking applies where an extraordinary event such as a severe storm causes damage to a utility resulting in great expense on repair and restoration of service to its customers. See e.g., the recent case of Re Kansas City Power & Light Co., 75 P.U.R.4th 1 (1986) (citing Narragansett, supra, the rule against retroactive ratemaking does not apply to expenses incurred as a result of extraordinary events such as ice storms); Re Kansas City Power & Light Co., 55 P.U.R.5th 468 (1983) (citing Narragansett, supra); Narragansett, supra; Wisconsin's Environmental Decade, Inc. v. Public Service Commission of Wisconsin, 298 N.W.2d 205 (Wis. Ct. App. 1980); and Re Florida Power Corp., 81 P.U.R.3d 394 (1969).
In Narragansett, supra, the Rhode Island Supreme Court explained the basis for allowing the power company to recoup the expense incurred from the effects of the extraordinary ice storm as follows:
The application of the rule against retroactive ratemaking to prevent the company from recovering the extraordinary cost of the ice storm would serve neither of the policies expressed above. Because of the unpredictable and severe nature of the storm, it is unlikely that company officials, in planning their operational expenses, could take into account the cost of repairing the widespread damage that occurred on January 14, 1978. The existing rates, moreover, as the commission indicated in its decision, were "not in any fashion [based on] the extraordinary expenses of restoration of service after the ice storm." Since the company incurred highly extraordinary expenses not covered by existing rates in combating this freakish storm, it is difficult to perceive how the future efficiency of the utility would be furthered by the application of the rule in this instance.
We have also noted that the rule serves to protect present customers from paying for a utility's past operating deficits. This aspect of the rule must be weighed against the interest of providing immediate service to customers when a destructive, unexpected storm occurs. On such an occasion the public interest in quickly restoring heat and electricity to the homes of customers must prevail.
* * * * * *
The next time a storm of this magnitude occurs, the company would have no incentive to hire outside line and tree crews to restore service efficiently and swiftly to customers if no reimbursement for extraordinary expenses would be forthcoming. Thus, application of the rule to expenses related to such an emergency *1362 situation so inextricably related to the public health and safety would serve to thwart the goal of effective customer service.

The plethora of cases from other jurisdictions permitting a utility to recover the extraordinary costs associated with an unusually severe storm indicate that the rule against retroactive ratemaking does not come into play in such instances. Re United Illuminating Co., 7 P.U.R.4th 417 (Conn.P.U.C. 1974); Re Diamond State Telephone Co., 28 P.U.R.3d 121 (Del.P.S.C. 1959); Re Southern Bell Telephone & Telegraph Co., 66 P.U.R.3d 1 (Fla. P.S.C. 1966); Re Kansas Power & Light Co., 8 P.U.R.4th 337 (Kan.S.C.C. 1975); Re Baltimore Gas & Electric Co., 25 P.U.R.3d 91 (Md.P.S.C. 1958); Boston Edison Co., D.P.U. 19300 (February 28, 1977); Re Detroit Edison Co., 20 P.U.R.4th 1 (Mich.P.S.C. 1977); Re Southwestern Bell Telephone Co., 92 P.U.R.N.S. 481 (Mo.P. S.C. 1952); Re Chrisp's Telephone Co., 65 P.U.R.3d 317 (Neb.S.R.C. 1966); Re Long Beach Water Co., 53 P.U.R.3d 495 (N.J.P.U.C. 1964); Re Long Island Lighting Co., 9 P.U.R.4th 21 (N.Y.P.S.C. 1975); Pennsylvania Public Utility Commission v. Pennsylvania Electric Co., 25 P.U.R.4th 342 (Penn.P.U.C. 1978). (Emphasis Added).
Narragansett at 179-180.
Earlier that same year the Wisconsin Court of Appeals held that Wisconsin's statutory proscription against retroactive ratemaking did not apply to recoupment of the amortized portion of an extraordinary loss caused by a severe ice storm. In so doing the court stated:
The supreme court has held that without statutory authority, rates are to be applied prospectively. Friends of the Earth v. PSC, 78 Wis.2d 388, 254 N.W.2d 299 (1977). In the case of Wisconsin Telephone Co. v. PSC, 232 Wis. 274, 303, 287 N.W. 122, 137 (1939), the court held that "in establishing a rate for the future and in the absence of statutory authorization therefor, the commission may not amortize a loss or make a rate sufficiently low to recapture the excesses." We cannot conclude, however, that the prohibition against retroactive rate making applies in the recouping of an extraordinary casualty loss.
Wisconsin's Environmental Decade, Inc. v. Public Service Commission of Wisconsin, 298 N.W.2d 205, 212 (Wis. Ct. App. 1980).
After a hearing on the matter, the Commission could have allowed the Company recovery for the expense incurred in repairing extraordinary storm damage.

B.

STORM RESERVE
Other juridictions have allowed utilities to provide for storm reserves. Cited in the quotation from Narragansett, supra, at 178-179 are references to decisions where utilities were allowed to provide for storm reserves.
In Re Detroit Edison Co., 43 P.U.R.4th 478 (1981), the Michigan Public Service Commission in considering severe storm damage stated:
The existing rates do provide for O and M expenses, which include expenses to cover repair, replacement and maintenance arising out of weather conditions. However, those rates provide only for the recovery of normal or ordinary expenses. They do not provide for the recovery of extraordinary expenses such as those being dealt with in this case.
43 P.U.R.4th at 487.
The New York Public Service Commission in Re Long Island Lighting Co., 9 P.U.R.4th 21 (1974), approved the recovery of past storm losses as well as the establishment of a reserve. "We conclude on this record that five year average $500,000.00 accrual appears to be the most reasonable amount to compensate the company for past losses and to provide, in time, a reserve against future storm losses." 9 P.U.R.4th at 35. See also, Re Long Island Lighting Co., 7 P.U.R.3d 140, 142 (1955).
In a proceeding involving Florida Power Corporation, 81 P.U.R.3d 394 (1969), the Florida Public Service Commission stated:

*1363 (1) This commission has for years recognized the use of a storm damage reserve which involves making periodic charges to operating expenses and accruing these amounts in a reserve. The area Florida Power Corporation serves is susceptible to hurricane damage. The purpose of this reserve is to avoid as much as possible extraordinary storm damage repair charges when such losses do occur.
.....
81 P.U.R.3d at 395.
These cases indicate that it is common practice for public service commissions to permit as an item of expense chargeable to ratepayers the establishment of a reserve for storm damage and to authorize, as a legitimate expense of operation, annual contributions to those storm reserves.
We think this is reasonable. But, however, as with expenses for storm damage actually incurred, charges for establishment of a storm reserve are allowable only after a hearing.

C.

LOST REVENUES
Of the $9,994,135.00 the Commission allowed the utility to amortize, as storm related expenses, $1,200,713.00 was revenue the utility did not collect when it was unable to provide power to its customers. It is the position of the Company that lost revenue is no less a component of storm damage than is the damage to its physical facilities. Therefore, the utility feels that it should be compensated for service that it never provided. Although no authority is cited by the utility for this proposition, the Commission is in agreement.
It should be noted that none of the cases cited herein, which allowed utilities to recover storm related expenses, ever once mentioned, or even alluded to, allowing the utilities to recover for revenue lost during the period when they failed to supply service to customers.
A review of the applicable code sections clearly relates that a "rate means every charge ... charged or collected by any public utility for any service ... offered by it to the public. ..." See Mississippi Code Annotated, § 77-3-3(e) (Supp. 1986). Additionally both Mississippi Code Annotated, § 77-3-39(5), and Mississippi Code Annotated, § 77-3-41 (Supp. 1985), which deal with the Commission's powers to fix rates by order contain the same language to the effect that after a hearing the Commission shall determine and fix by order such rate or rates as will yield a fair return to the public utility for furnishing service to the public. Granting the Company a rate increase for power not delivered in service would require customers who incurred additional expenses because of "outage" to pay fees in addition to those previously incurred.
The Commission does not have the authority to grant a rate increase for power never delivered.
It is not necessary to discuss the remaining assignments of error because we reverse and remand for the failure to hold a hearing.
Based on the foregoing, we reverse and remand for a hearing to determine the issues discussed herein in a manner consistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN LEE, P.JJ., and PRATHER, ROBERTSON, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.