**Dennis J. ROBERTS II, Attorney General**

v.

**PROVIDENCE WATER SUPPLY BOARD.**

No. 81–331–M.P.

Supreme Court of Rhode Island.

Jan. 28, 1983.

Dennis J. Roberts II, Atty. Gen., John R. McDermott, Sp. Asst. Atty. Gen., for petitioner.

William J. McGair, Providence, for respondent.

OPINION

KELLEHER, Justice.

This is a statutory petition for certiorari which has been filed pursuant to the terms of G.L.1956 (1977 Reenactment) § 39–5–1. The Attorney General, in filing the petition, seeks to overturn a refusal by the Public Utilities Commission (PUC) to consider an alleged misuse of funds by the Providence Water Supply Board (the board) as the PUC authorized an increase in rates charged by the board so that the latter's annual revenues would be increased by almost $2,400,-000. In order that we may put the only issue in this controversy into its true focus, it is necessary that we give a brief history of the board's development and activities.

The board came into existence with the enactment of P.L. 1915, ch. 1278, which is entitled "An Act to Furnish the City of Providence with a Supply of Pure Water." This legislation, in addition to creating the board, gave the board the right to set the rates to be charged customers, authorized the city to condemn land in Scituate, and called for the payment of the cost of the project by the issuance of bonds. Section 26 of ch. 1278, after directing the city to maintain a sinking fund, the proceeds of which were to be used to redeem all water bonds previously or thereafter issued, specifically directed that "all excess of receipts from water rents over and above the necessary expenses of managing the water works of said city * * * shall be placed in said sinking fund * * *." As the years passed by, the board developed the Scituate Reservoir system and through the foresight, dedication, and expertise of its professional staff, such as that exhibited by the late Philip J. Holton, the board's longtime chief engineer, the board's operations have flourished to the point where the board's Scituate watershed now extends over an area of

92.8 square miles [1] and the residents of several municipalities of this state besides Providence now have the use of a quality product that is sold at a reasonable price.

Back on March 3, 1967, Providence's then city solicitor wrote a letter in which he replied to an inquiry by the city's finance director as to whether the annual surplus in the sinking fund could be transferred to the city's general fund once the last of the revenue bonds had been redeemed in early 1968. In his opinion the solicitor expressed the belief that once all of the bonds had been retired, the annual surplus could be transferred by an appropriate vote of the city council from the sinking fund to the city's general fund.

Before the PUC and before us at oral argument, the Attorney General's representative claimed that between the years 1968 and 1982 over $5,700,000 was transferred from the sinking fund to the general fund, and he described such transfers as being "ultra vires" and void. On the other hand, the board maintains that the transfers occurred during the four-year period 1968 through 1972 and that the total amount was considerably less than the $5 million-plus figure used by the Attorney General. Understandably enough, the board does not concede that the transfers were illegal. The Attorney General urged the PUC to recover the illegally transferred funds by offsetting from the board's proposed cash requirements certain payments due the city for a variety of items, such as municipal taxes or services rendered by the city's Public Works Department in resurfacing highways after the board had installed water mains. The PUC acknowledged the differing points of view that were expressed regarding the illegality of the transfer but decided not to resolve the issue because it declined "to engage in retroactive ratemaking"; it also took the position that the transfers in question took place at a time when the board was not subject to the PUC's jurisdiction.[2]

The situation presented here is somewhat similar to that in *Narragansett Electric Co. v. Burke,* R.I., 404 A.2d 821 (1979), in which several years after a rate increase had been approved we considered the PUC-ordered refund of a portion of the increase because of an improper ex parte meeting between representatives of the utility and the chairman of the PUC. In quashing the refund order, we emphasized that in Rhode Island ratemaking is a quasi-judicial function; and since rates are prospective in nature, they may not be designed to recoup past losses. In light of our 1979 action in quashing the PUC's refund order, we see no reason to fault the PUC for its unwillingness to pursue the Attorney General's suggestion.

The petition for certiorari is denied and dismissed, and the record certified to us is returned to the PUC with our decision endorsed thereon.

---

1. Journal-Bulletin Rhode Island Almanac at p. 91 (96th ed. 1982).

2. In *City of Providence Water Supply Bd. v. Public Utilities Comm'n,* R.I., 414 A.2d 465, 466 (1980), this court noted a contradiction when with one hand the Legislature in 1967 seemed to give exclusive jurisdiction over all municipal water-service systems to the PUC while with the other hand it preserved the right of the board to determine the rate at which Providence water would be sold. We found the conflicting legislative enactments to be irreconcilably repugnant and ruled that the board still retained the power to set the rates for the customers it serviced. Within days of the publication of our opinion, the Legislature enacted P.L.1980, ch. 335, and made it clear that the Water Supply Board of the City of Providence was a public utility and thereby subject to the PUC's jurisdiction.