**LIBERTY MUTUAL INSURANCE COMPANY, Liberty Mutual Fire Insurance Company, and Liberty Mutual Insurance Corporation**

**v.**

**Maurice C. PARADIS, in his capacity as Director of the Department of Business Regulation and as Insurance Commissioner of the State of Rhode Island, Dennis I. Revens, in his capacity as Administrator of the Workers' Compensation Court, William F. Tammelleo, in his capacity as Director of the Department of Labor and Acting Director of the Department of Workers' Compensation, and James E. O'Neil, in his capacity as Attorney General of the State of Rhode Island.**

**Civ. A. No. 91–0222–T.**

United States District Court, D. Rhode Island.

May 22, 1991.

Deming E. Sherman, William P. Robinson, III and Judith Colenback Savage, Edwards & Angell, Providence, R.I. (William F. Cupelo, Liberty Mut. Ins. Co., Boston, Mass., of counsel), for plaintiffs, Liberty Mut. Ins. Co., Liberty Mut. Fire Ins. Co. and Liberty Mut. Ins. Corp.

Richard B. Wooley, Asst. Atty. Gen., and Ellen Evans Alexander, Sp. Asst. Atty. Gen., Providence, R.I., for defendants, Maurice C. Paradis, Dennis I. Revens, William F. Tammelleo and James E. O'Neil.

Marc Gursky, Providence, R.I., for intervenors R.I. AFL–CIO.

## MEMORANDUM AND ORDER

TORRES, District Judge.

This is an action to declare void a Rhode Island statute requiring the future payment of annual cost-of-living adjustments to totally disabled workers' compensation recipients injured prior to the effective date of the statute and to enjoin the pertinent state officials from enforcing that requirement. The theory on which the plaintiffs seek relief is that the statute is unconstitutional because it impairs the contracts between the plaintiff and its insureds in violation of Article I, Section 10 of the United States Constitution and it constitutes a taking of the plaintiff's property without either due process of law or just compensation in violation of the Fourteenth and Fifth Amendments respectively. The case is presently before the Court for decision on the plaintiff's motion for a preliminary injunction.

### THE STATUTE

In July of 1990, Rhode Island adopted an amendment to its Workers' Compensation Act requiring that, effective May 10, 1991, payments made to all recipients who have been totally disabled for more than 52 weeks be increased by an annual cost-of-living adjustment ("COLA") based on increases in the Consumer Price Index compiled by the United States Department of Labor. The amendment was part of a legislative package that also contained provisions designed to discourage fraudulent claims and reduce the insurers' liability for payment to partially disabled workers and those sustaining aggravations of previous injuries. The amended version of the statute states:

> Where any employee's incapacity is total and has extended beyond fifty-two (52) weeks, *regardless of date of injury,* ... payments made to all such incapacitated employees shall be increased as of May 10, 1991, and annually on the tenth (10th) day of May thereafter so long as the employee remains incapacitated. The increase shall be by an amount equal to the total percentage increase in the annual consumer price index ... as ... computed by the bureau of labor statistics of the United States department of labor.

R.I.Gen.Laws § 28–33–18.3(B)(1) (1990 Supp.) (emphasis added).

Liberty Mutual Insurance Company ("Liberty") contends that requiring payment of COLAs to workers already receiving benefits pursuant to insurance policies issued before the amendment's effective date is unconstitutional because it forces Liberty to absorb the costs of the payments without any prospect of recovering the additional expense through the rate-making process.

### FACTS

The pertinent facts underlying Liberty's motion were developed during an evidentiary hearing conducted on May 8, 1991. Liberty collects approximately $60 million in annual premiums for workers' compensation insurance policies issued in Rhode Island. About 90% of that amount is attributable to policies for which the premiums are calculated prospectively at the beginning of the policy period and, therefore, are fixed irrespective of what losses may be experienced. The remaining 10% derives from retrospectively rated policies that provide for adjustments of the premium at various times after expiration of the policy period to reflect the amounts actually paid to satisfy claims. However, many retrospectively rated policies contain a cap that limits the additional amounts the insurer can collect by way of subsequent adjustments.

Liberty is currently paying benefits to 63 Rhode Island workers who have been classified as totally incapacitated for more than 52 weeks and therefore would be eligible for annual COLAs. It does not know how many of those workers are receiving benefits under retrospectively rated policies but projects the total costs of these COLAs over their lifetimes to be nearly $20 million. However, during the one-year period that it will probably take before this case is in order for a trial on the merits, the aggre-

gate cost will be only in the vicinity of $32,000. That figure is approximately .04% of the $65 million Liberty pays out annually in claims.

## PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is a drastic form of relief because it affects the rights of a party before that party has had an adequate opportunity to develop and present the merits of its case. Consequently, courts have devised a rather rigorous standard that must be satisfied before such relief is granted.

That standard is well established. It requires the party seeking the injunction to demonstrate:

(1) That it does not have an adequate remedy at law and will suffer irreparable harm before the case can be litigated on the merits if the injunction is *not* granted;

(2) That such harm outweighs any harm that the adverse party will suffer if the injunction *is* granted;

(3) That it is likely to ultimately succeed on the merits of its claim; and

(4) That the requested injunction will not adversely affect the public interest. *Collazo Rivera v. Torres Gaztambide*, 812 F.2d 258, 259 (1st Cir.1987); *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st. Cir.1981).

### I. *Public Interest*

In this case, analysis of how the public interest would be affected by granting or denying the injunction contributes little to the determination that the Court must make because there are equally compelling interests that directly clash with each other.

On the one hand, the public has a strong interest in seeing that disabled workers are fairly compensated so that they can maintain an adequate standard of living and not become public charges. On the other hand, the public has an equally strong interest in seeing that fundamental constitutional rights are upheld and that governmental responsibilities are not unfairly thrust upon small groups of individuals or private businesses by requiring them to bear what should be public burdens.

Fortunately, the other three factors in the preliminary injunction equation provide much clearer guidance as to whether a preliminary injunction should issue.

### II. *Irreparable Harm to Plaintiff*

Liberty asserts that it will be irreparably harmed if a preliminary injunction is not granted because, if it ultimately prevails, it will be unable to recover COLA payments made in the interim. However, it cites no facts or law to support that assertion.

Since Liberty presumably knows the identity of the COLA recipients, there is nothing to prevent it from seeking reimbursement from them if the occasion arises. Moreover, since the recipients of those COLAs are individuals who are permanently incapacitated, they will continue to receive their previously established benefits for a considerable period of time. Therefore, there is no apparent reason why the COLA payments could not be deducted from future payments. Indeed, although it does not deal with this specific situation, R.I.Gen.Laws § 28–33–18.1 expressly authorizes an insurer to offset payments to which a totally incapacitated employee was not entitled against future benefits payable to that employee.

Even in the absence of a ready method to recover the COLAs, the requisite showing of irreparable harm would be lacking because the harm in this case would be self-inflicted. As previously noted, the amendment in question was adopted in July of 1990 but did not take effect until May 10, 1991. For reasons that have not been satisfactorily explained, Liberty waited until April 30, 1991, ten days before the first COLA payments became due, to commence this suit. Thus, like the apocryphal young man who is convicted of murdering his parents and pleads for mercy on the ground that he is an orphan, Liberty is largely responsible for the circumstances giving rise to the harm of which it complains. In such situations, a court of equi-

ty is far less inclined to grant emergency relief.

### III. *Irreparable Harm to Defendants*

A much different picture emerges when one looks at the harm that would befall the COLA recipients, many of whom are members of the AFL–CIO which has intervened as a party defendant, if an injunction is issued. Because they are classified as totally incapacitated, their workers' compensation benefits presumably constitute all or most of the incomes on which they support themselves. The evidence indicates that more than half of them have been totally incapacitated for at least ten years, during which time their benefits have been frozen at a level based on their earnings at the time they first qualified for compensation.

The Court takes judicial notice of the fact that during the past ten years the cost of living has increased considerably thereby significantly eroding the purchasing power of those benefits. Therefore, delaying COLA payments to those individuals will likely have an appreciable impact on them.

What is more, the adverse impact on the recipients that would result from withholding 5% of their incomes would far outweigh the almost minuscule impact on Liberty that would be caused by adding .04% to the amount it is required to pay in annual benefits.

In short, the so-called "balancing of the harms" component of the preliminary injunction test militates strongly against granting a preliminary injunction. Furthermore, analysis of the likelihood of success factor does not alter this result.

### IV. *Likelihood of Success*

Liberty advances three theories for declaring the 1990 amendment unconstitutional. First, it argues that the amendment violates Article I, Section 10 of the United States Constitution because it impairs obligations under Liberty's contracts of insurance with covered employers by retroactively increasing the benefits it must pay. Second, Liberty contends that the amendment deprives Liberty of proper-

ty without due process of law in violation of the Fourteenth Amendment by increasing the benefits Liberty must pay under past policies without giving it any opportunity to provide for this additional cost. Finally, Liberty asserts that the amendment constitutes a taking of its property without just compensation in violation of the Fifth Amendment.

All three arguments rest on the common premise that Liberty will be unable to recover the additional cost of the COLAs in question through the ratemaking process. If Liberty is permitted to include this cost in its rate base for future policy years, then obviously it will sustain no loss.

An assessment of the validity of Liberty's premise must begin with an examination of R.I.Gen.Laws § 27–7.1–1 to –13 which governs the manner in which rates for workers' compensation insurance are set. The pertinent section of that title is § 27–7.1–7 which enumerates the standards to be applied in determining rates. The only relevant factors are contained in subsection (d) which states:

> The justness and reasonableness of rates shall be determined for the period in which the rates shall be in effect.

R.I.Gen.Laws § 27–7.1–7(d).

Despite Liberty's urgings, the Court finds nothing in that language that prohibits the Director of Business Regulation from allowing an insurance company to include in its rate base the cost of COLAs it must pay during the period for which its rate is in effect.

It may be true, as Liberty's actuary testified, that, generally speaking, insurance rates are calculated based upon projected claims and expenses referable to policies that will be issued during the period covered by the rate and do not include any allowance for losses attributable to policies issued during previous years. Nevertheless, Liberty is unable to point to any statute, regulation or case law that would prevent the Director from allowing the recovery of unforeseeable expenses incurred under the unique circumstances presented in this case.

Liberty cites several Rhode Island Supreme Court decisions for the general proposition that ratemaking is prospective only. *E.g., Narragansett Electric Co. v. Burke,* 404 A.2d 821 (R.I.1979), *cert. denied,* 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980); *Roberts v. Providence Water Supply Board,* 455 A.2d 316 (R.I.1983). Apart from the fact that those cases deal with public utility rates that are governed by a different statute, they are inapposite for two reasons.

First, they refer to situations in which an effort was made to recoup losses *incurred* in the *past* through future rates. In this case, the additional COLA expenses may be referable to policies issued in the past, but they are expenses to be *incurred* in the *future.* They become payable on May 10, 1991, and on the tenth day of May each year *thereafter,* and they relate only to benefits to be paid during the *succeeding* year. Therefore, it is far from clear that they would be viewed by Rhode Island regulators as past losses.

Second, even if the COLAs are considered past losses they still may be recoverable. The Rhode Island Supreme Court has recognized an exception to the general prohibition against recoupment of even past losses when they are extraordinary in nature and flow from unpredictable events. Thus, in *Narragansett Electric Co. v. Burke,* 415 A.2d 177 (R.I.1980), the court permitted an electric company to recoup past losses arising from a severe ice storm. Similarly, in *Providence Gas Co. v. Burke,* 475 A.2d 193 (R.I.1984) it allowed a gas company to recoup the additional expense resulting from a municipal property tax surcharge that could not have been foreseen when the previous year's rate was established. In doing so, the court stated:

> The specter of retroactive ratemaking must not be viewed as a talismanic inhibition against the application of principles based upon equity and common sense.

*Providence Gas Co.,* 475 A.2d at 198 (quoting *Roberts v. Narragansett Electric Co.,* 470 A.2d 215, 217 (R.I.1984)).

Consequently, even if including the costs of COLAs in Liberty's rate base is viewed as retroactive ratemaking, it is at least arguable that it falls within the aforesaid exception.

This Court need not and should not determine the propriety of allowing Liberty to include that cost in its rate filings or the likelihood that it may succeed in any such effort. That is a matter that should be determined, at least in the first instance, by the Director of Business Regulation. This Court is not the proper forum for resolving unsettled questions of state law involving vital state interests. Nor is this Court an alternative forum in which what are essentially regulatory matters properly entrusted to duly constituted state agencies may be litigated.

In these respects, the principles of abstention enunciated by the United States Supreme Court in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) and *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), counsel that this Court take no action until the state proceedings have run their course, which should be relatively soon. Like *Burford,* this case involves a complex matter in a highly regulated industry in which there is a predominant state interest and where there is available an adequate and expeditious means for state review. Also, like *Pullman,* this case presents constitutional issues that may become moot depending on the manner in which unclear questions of state law are decided. In both circumstances the Supreme Court has said that federal courts should be reluctant to intervene at least until the state has had an opportunity to resolve the state law questions.

## CONCLUSION

For all of the foregoing reasons, the plaintiff's motion for preliminary injunction is denied.

IT IS SO ORDERED.