# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CC-01249-SCT

*MISSISSIPPI RURAL WATER ASSOCIATION, INC.*

*v.*

*MISSISSIPPI PUBLIC SERVICE COMMISSION, BRANDON PRESLEY, IN HIS OFFICIAL CAPACITY, CECIL BROWN, IN HIS OFFICIAL CAPACITY AND SAMUEL F. BRITTON, IN HIS OFFICIAL CAPACITY*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/04/2015 |
| TRIAL JUDGE: | HON. PATRICIA D. WISE |
| TRIAL COURT ATTORNEYS: | BEN H. STONE |
| | LARRY D. MOFFETT |
| | JAMES H. HERRING |
| | SHELLY M. BASS |
| | SHAWN S. SHURDEN |
| | LAURA H. DIXON |
| | FRANK F. FARMER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAMES H. HERRING |
| ATTORNEYS FOR APPELLEES: | FRANK F. FARMER |
| | LAURA H. DIXON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED, RENDERED AND VACATED - 02/09/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.    The Mississippi Public Service Commission (MPSC) adopted a rule requiring utilities to waive utility deposits for certified domestic violence victims for a period of sixty days.

The rule also required the utilities to keep the information regarding the domestic violence victims confidential and established penalties for violating that confidentiality. The Mississippi Rural Water Association, Inc. ("Water Association") appealed to the Hinds County Chancery Court objecting to the promulgation of the new rule, but the chancery court affirmed the MPSC's decision. We find that the MPSC lacks statutory authority to adopt any rule regulating the rates of nonprofit water utility associations and corporations. Accordingly, we render judgment vacating the MPSC's order adopting the new rule.

## FACTS AND PROCEDURAL HISTORY

¶2. In June 2013, the MPSC declared its intent to consider the adoption of a Rule of Practice and Procedure regarding the waiver of initial utility deposits for domestic violence victims. The original proposed rule stated:

> A customer or applicant that has been determined to be a victim of domestic violence by a domestic violence program, by law enforcement personnel, by the office of a District Attorney, or by the office of the Attorney General, shall be exempt from public utilities' initial deposit requirements as established in that utility's tariff. This determination shall be evidenced by submission of a certification letter to the utility. The certification letter must be printed on the letterhead of the certifying agency or accompanied by a letter on agency letterhead identifying the certifying individual. The utility shall deem the certification letter and the contents thereof as confidential. The certification letter expires after ninety (90) days.

By its terms, this rule applies to all public providers of water service, both for-profit and nonprofit. Because the proposed rule would affect the MPSC's existing rules governing public utility service, the MPSC sought comment on the rule from all interested parties and public utilities. In October 2013, the MPSC filed a scheduling order regarding the due date

2

for further comments or testimony regarding the proposed rule, set a public hearing for December 2013, and attached an Economic Impact Statement (EIS).

¶3.     The Water Association is a Mississippi nonprofit corporation and operates as a trade association representing more than 500 water and/or sewage disposal companies, most of which are nonprofit corporations.  The Water Association moved to intervene on behalf of its nonprofit members and submitted multiple comments to the proposed rule, including expert affidavits by engineer James A. Elliott.  In its comments, the Water Association argued, among other things, that Section 77-3-5 of the Mississippi Code prohibited the MPSC from regulating nonprofit utilities' rates or internal affairs. It also argued that the MPSC had failed to comply with the requirements of the Mississippi Administrative Procedures Act because the EIS filed with the proposed rule was deficient.

¶4.     The public hearing on the proposed rule was ultimately scheduled for August 5, 2014. On July 28, 2014, the MPSC sent counsel for the Water Association a draft of the new proposed rule, which included substantial changes from the original proposal:

> A customer or applicant that has been determined to be a victim of domestic violence by a domestic violence program shall be exempt from public utilities' initial deposit requirements, as established in that utility's tariff, for a period of sixty (60) days.  This determination shall be evidenced by submission of a certification letter to the utility.  The certification letter must be printed on the letterhead of the certifying agency or accompanied by a letter on agency letterhead identifying the certifying individual.  The certification letter expires after ninety (90) days.
>
> The utility shall deem the certification letter and the contents thereof as confidential.  Any employee, contractor, volunteer or agent of a public utility in possession of information which would tend to identify a victim of domestic violence, who discloses any information that is exempt from disclosure under the Mississippi Public Records Act of 1983, or makes any observation or

3

comment about the identity or condition of any person admitted to a shelter or receiving services of a shelter, unless directed to do so by an order of a court of competent jurisdiction, shall be subject to all applicable penalties imposed by Mississippi law for violation of Commission rules and, in addition, shall be civilly liable to the person whose personal information was disclosed in the amount of Ten Thousand Dollars ($10,000.00), plus any compensatory damages that the individual may have suffered as the result of the disclosure and any penalties imposed.

In addition to adding a penalty to the confidentiality provision, the new language changed the complete deposit exemption to a temporary sixty-day waiver. After reviewing the new language, the Water Association submitted additional comments and a new affidavit by Elliot analyzing the new language in the proposed rule.

¶5. The public hearing was held on August 5, 2014. The Water Association and several other utility associations appeared at the hearing and opposed the new rule. On September 9, 2014, the MPSC unanimously passed a final order adopting the rule temporarily waiving deposits for domestic violence victims. The final rule, which applies to nonprofit water associations, states:

1. TEMPORARY WAIVER OF DEPOSIT A customer or applicant that has been determined to be a victim of domestic violence by a domestic violence shelter, as defined in Miss. Code Ann. § 93-21-101 (2014), shall be exempt from public utilities' initial deposit requirements, as established in that utility's tariff for new accounts at existing service locations, for a period of sixty (60) days. This determination shall be evidenced by submission of a certification letter to the utility. The certification letter must be printed on the letterhead of the certifying agency or accompanied by a letter on agency letterhead identifying the certifying individual. The certification letter expires after ninety (90) days.

2. CONFIDENTIALITY OF CERTIFICATION LETTER The utility shall deem the certification letter and the contents thereof as confidential. Any employee, contractor, volunteer or agent of a public utility in

possession of information which would tend to identify a victim of domestic violence, who discloses any information that is exempt from disclosure under the Mississippi Public Records Act of 1983, or makes any observation or comment about the identity or condition of any person admitted to a shelter or receiving services of a shelter, unless directed to do so by an order of a court of competent jurisdiction, shall be subject to all applicable penalties imposed by Mississippi law for violation of Commission rules, and in addition, shall be civilly liable to the person whose personal information was disclosed in the amount of Ten Thousand Dollars ($10,000.00), plus any compensatory damages that the individual may have suffered as the result of the disclosure and any penalties imposed.

The Water Association applied for rehearing, which the MPSC denied.

¶6. The Water Association then appealed the MPSC's decision to the Hinds County Chancery Court, arguing that: (1) the MPSC lacks jurisdiction over the governance, management, or other internal affairs of the members of the Water Association and thus lacked jurisdiction to apply the rule to them; (2) the MPSC lacks authority to regulate the rates and rate-collection procedures, including deposit procedures, of the members of the Water Association and thus lacked authority to apply the rule to them; (3) the MPSC violated the Administrative Procedures Act by adopting a final rule that differed from the proposed rule in a manner not allowed under the Act; (4) the MPSC violated the Administrative Procedures Act's provisions governing consideration of the economic impact of a rule; and (5) the MPSC erred by allowing the members of the Water Association and their employees to become subject to civil and criminal liability for violation of the rule.

¶7. The chancery court affirmed the MPSC's adoption of the rule, reasoning that a deposit is not included in the definition of "rate" or "rate structure," remains the property of the customer unless a debt is incurred, and is within the utility company's discretion to

5

impose. The chancery court also found no violation of the Administrative Procedures Act. It concluded that the final rule was the logical result of comments filed by interveners and simply incorporates existing Mississippi law. The chancery court declined to find the EIS insufficient as a matter of law.

¶8.     On appeal to this Court, the Water Association raises nineteen issues which essentially track the issues raised in its appeal to the chancery court. We find one issue to be dispositive: whether the MPSC lacked statutory authority to adopt the rule in question because nonprofit corporations and associations are not subject to MPSC regulation of rates. Accordingly, it is unnecessary to address the remaining issues.

**STANDARD OF REVIEW**

¶9.     When this Court reviews a chancellor's ruling concerning an administrative agency decision, we apply the same standard of review as the chancellor. ***Miss. Comm'n on Envtl. Quality v. Chickasaw Cty. Bd. of Supervisors***, 621 So. 2d 1211, 1216 (Miss. 1993). This Court has the authority to reverse the decision of the PSC if we find that it (1) was not supported by substantial evidence, (2) is arbitrary or capricious, (3) was beyond the PSC's power to adopt, or (4) violates of some constitutional or statutory provision. ***Town of Enterprise v. Miss. Pub. Serv. Comm'n***, 782 So. 2d 733, 735 (Miss. 2001). "It is clear under Mississippi law that an administrative agency cannot exceed the scope of authority which was granted to it by the legislature." ***Miss. Bd. of Nursing v. Belk***, 481 So. 2d 826, 829 (Miss. 1985) (citations omitted). "Further, the Commission's authority to interpret the statutes under which it operates may not supersede the requirements thereof, nor may it

6

conflict with pertinent rules of law." ***State ex rel. Pittman v. Miss. Public Serv. Comm'n***, 520 So. 2d 1355, 1358 (Miss. 1987) (citing ***Capital Electric Power Ass'n v. Miss. Power & Light Co.***, 125 So. 2d 739, 744 (Miss. 1961)).

## DISCUSSION

¶10.    The Mississippi Legislature has vested the MPSC with "exclusive original jurisdiction over the intrastate business and property of public utilities." Miss. Code Ann. § 77-3-5 (Rev. 2009). However, the MPSC does *not* have the authority "to regulate the rates for the sales and/or distribution . . . [o]f water or sewage disposal service of *nonprofit corporations or associations* where the governing body . . . is elected by the consumers thereof or appointed by the county board of supervisors[.]"  *Id.* at 77-3-5(c) (emphasis added). Under the specific language of Section 77-3-5(c), the MPSC does not have the authority to adopt rules regulating the Water Association members' rates for the sale and distribution of water and sewage disposal services.  The Water Association argues that the rule in question violates Section 77-3-5 because customer deposits are included in the rate-setting process and the rule's deposit-waiver requirement therefore has a direct impact on its members' rates. Thus, the critical question before this Court is whether customer deposits are included within the definition of the term "rate" in Section 77-3-5.

¶11.    The Legislature has specifically defined term "rate" as it is used in the Public Utilities Act:

> The term "rate" means and includes *every* compensation, fare, toll, rental and classification, *or the formula or method by which such may be determined*, or any of them, demanded, observed, charged or collected by any public utility for any service, product or commodity described in this section, offered by it

7

to the public, *and any rules, regulations, practices or contracts relating to any such compensation*, charge, fare, toll, rental or classification[.]

Miss. Code Ann. § 77-3-3(e) (emphasis added). The MPSC admits that Section 77-3-3(e) "broadly defines 'rate.'" Indeed, this definition encompasses not only the typical usage of the term "rate" – "the unit cost of a service supplied to the public by a utility"[1] – but also includes the "formula or method" by which the compensation is determined, as well as "any rules, regulations, practices or contracts relating to any such compensation[.]" *Id.* When read in conjunction with this definition, Section 77-3-5 prohibits the PSC from regulating not only the amounts charged by nonprofit public utilities for their services, but also the formula used to calculate that amount and any rules or regulations related to this process.

¶12. The MPSC attempts to create a distinction between a "rate" and a "deposit" by arguing that the former is compensation for a service rendered while the latter is a precondition or security to receiving service. The MPSC claims that because customer deposits are collected before any sales occur and before service is rendered, they do not constitute "rates for the sales and/or distribution" of water under Section 77-3-5. But this argument is belied by the broad language of Section 77-3-3(e) and the MPSC's prior interpretations of the term "rate." The Water Association presented evidence of a prior proceeding before the MPSC in which a 1992 subdivision ordinance of the City of Meridian was challenged as violating the MPSC's regulatory authority under the Public Utilities Act. The ordinance at issue required utility providers to install underground utility service at no

---

[1] *Black's Law Dictionary* 1452 (10th ed. 2014). This narrow definition and the other dictionary definitions cited by the MPSC are irrelevant to the instant case, as the Legislature has defined the term "rate" as used in the Public Utilities Act.

cost to the owner or developer of land being subdivided, unless the utility provider could prove beyond a reasonable doubt that the cost of underground service was not economically feasible over a twenty-year time span. Citing Section 77-3-3(e), the MPSC found that the term "rate" is broadly defined to include not only the charge itself, but also the formula by which the charge is determined and any rules and regulations relating to the charge. The MPSC then determined that the ordinance "clearly attempts to establish both the method to determine the charge and the charge itself; i.e., at no cost." The MPSC also found that "[t]he manner of service also directly affects the costs to the utility and thus the rates the utility will charge." Accordingly, the MPSC concluded that the ordinance constituted a rate, which infringed on its exclusive authority over utility regulation.

¶13. At first glance, it would appear that the ordinance described above does not fit within the most narrow dictionary definition of the term "rate." However, the MPSC found that the ordinance fit squarely within the definition provided in Section 77-3-3(e) because the requirement of providing underground utility service at no cost would have an obvious and substantial effect on the formula by which the utility provider determined the rates it would charge to its customers. The same is true here. As set forth in the affidavit of James Elliot, which was presented to the MPSC and the chancery court, a public utility's tariff generally includes the utility's rate and charges for service, including initial deposits, service extension policies, and regulations unique to each company. In addition, the Water Association presented evidence of another utility company's application to the MPSC to increase its rates, the formula for which included customer deposits. As with the ordinance

9

described above, the MPSC's rule in this case has an obvious effect on utility companies' rate-setting formulas. The critical distinction in this case, however, is that the MPSC does *not* have statutory authority to regulate the rates of nonprofit water associations, and the rule in question directly applies to them.

¶14. The MPSC also argues that the rule affects only the timing of the deposit payment. But the MPSC's attempt to regulate the payment of customer deposits, which are embedded in the rate-making process, would do more than impact the timing of payment. As the Water Association sets out in its brief, collecting a timely deposit plays an integral role in a water association's ability to (1) determine the amount of the deposit and protect against bad debts, (2) ensure that the deposit is paid since services already would be provided, and (3) protect itself against losses arising from customers', especially transient customers', failure to pay for services.

¶15. We find that Section 77-3-3(e) includes customer deposits in the definition of the term "rate" as it is used in the Public Utilities Act, and Section 77-3-5 prohibits the MPSC from making rules that regulate the rates of the Water Association's members. Accordingly, the MPSC lacked authority to adopt the rule in question. Because the MPSC did not have authority to adopt this rule, it is unnecessary for use to address the Water Association's arguments concerning the MPSC's compliance with the Administrative Procedures Act.

## CONCLUSION

¶16. For the foregoing reasons, we reverse the judgment of the chancery court, and we render judgment here vacating the order of the MPSC adopting the deposit-waiver rule.

¶17. **REVERSED, RENDERED AND VACATED.**

10

**RANDOLPH, P.J., COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KITCHENS, J. CHAMBERLIN, J., NOT PARTICIPATING.**

**KING, JUSTICE, DISSENTING:**

¶18. Because I believe that the Mississippi Public Service Commission (MPSC) clearly has the authority to enforce the regulation at issue on the rural water associations, I respectfully dissent. The deposits at issue are not within the statutory definition of "rates." Furthermore, the Mississippi Rural Water Association's other arguments that the rule does not apply to its members likewise fail.

***1. The rule does not regulate "rates."***

¶19. "In all actions and proceedings arising under the provisions of this article or growing out of the exercise of the authority and powers herein granted to the commission, the burden of proof shall be on the party seeking to vacate an order of said commission." Miss. Code Ann. § 77-3-77 (Rev. 2009).

¶20. In interpreting agency statutes, exceptions in statutes are ordinarily given a strict or narrow construction. ***Miss. Dep't of Wildlife, Fisheries and Parks v. Miss. Wildlife Enforcement Officers' Ass'n, Inc.***, 740 So. 2d 925, 932 (Miss. 1999) (citing 73 Am. Jur. 2d *Statutes* § 313, at 463-64 (1974)). Moreover, the agency that administers or enforces a statute is entitled to deference to its interpretation of the statutes, "unless that interpretation is repugnant to the plain meaning of the statute . . . or the best reading of the statute." ***Miss. Gaming Comm'n v. Imperial Palace of Miss., Inc.***, 751 So. 2d 1025, 1029 (Miss. 1999). Statutory exemptions to jurisdiction are to be construed narrowly, and in accordance with

11

general principles of statutory interpretation. ***Miss. Dep't of Wildlife, Fisheries and Parks v. Miss. Wildlife Enforcement Officers' Ass'n, Inc.***, 740 So. 2d 925, 932 (Miss. 1999).

¶21.    The MPSC is empowered to regulate public utilities.  Miss. Code Ann. § 77-3-2 (Rev. 2009).  The MPSC has "exclusive original jurisdiction over the intrastate business and property of public utilities."  Miss. Code Ann. § 77-3-5 (Rev. 2009).  However, the MPSC shall not "have jurisdiction to regulate the rates *for the sales and/or distribution . . .* [o]f water or sewage disposal service by nonprofit corporations or associations where the governing body of such corporation or association is elected by the consumers thereof or appointed by the county board of supervisors." Miss. Code Ann. § 77-3-5(c) (Rev. 2009) (emphasis added).  Thus, as the specific statute covering the exemption states, the MPSC does not have jurisdiction to regulate the rates for the sales and/or distribution of water of the members of the Water Association.  The question is therefore whether the domestic violence rule regulates the rates of the members of the Water Association and is thus beyond the MPSC's jurisdiction.  In making this determination, the Court must construe the exception to the MPSC's jurisdiction narrowly and give deference to the MPSC's interpretation of the statute, unless that interpretation is repugnant to the plain meaning or the best reading of the statute.[2]

¶22.    "Rate" is defined as including

---

[2]Notably, the majority seems to simply disagree with the MPSC's interpretation of its own statute, and does not appear to employ the deferential standard of review that we are required to apply to administrative agencies.  It fails to explain how the MPSC's interpretation is *repugnant* to the plain language or best reading of the statute, and simply substitutes its opinion of the best reading of the statute for the MPSC's.

every compensation, charge, fare, toll, rental and classification, or the formula or method by which such may be determined, or any of them, demanded, observed, charged or collected by any public utility for any service, product or commodity described in this section, offered by it to the public, and any rules, regulations, practices or contracts relating to any such compensation, charge, fare, toll, rental or classification[.]

Miss. Code Ann. § 77-3-3(e) (Rev. 2009). The term "deposit" is not defined.

¶23. The Water Association argues that the definition of "rate" is sufficiently broad so as to include deposits. It also claims that a deposit is part of the rate structure, thus exempting a deposit from MPSC jurisdiction. The Water Association also points to a comment from the *Lexis Nexis Accounting for Public Utilities* publication that state that "deposits are available to the utility for use in support of its rate base investment."[3] The MPSC argues that "rate" clearly does not encompass deposits, pointing to dictionary definitions of the two words.

¶24. It is clear from the statute defining rates that a difference exists between regulating *rates* or the formula to determine rates, and regulating something that *may* result in *impacting* rates. In this case, the MPSC is regulating something that impacts rates, i.e., a deposit, and it is not regulating the rates or rate formulas themselves. In terms of the rate base, the statute defining "rate" indicates that the MPSC may not regulate certain practices related to rates, such as the rate formula. With the domestic violence rule, the MPSC is not doing so. The MPSC has *not* mandated that utilities remove deposits from their rate base

---

[3]However, that same publication seems to define deposits as something other than some sort of charge collected for some service. It states that deposits "generally represent funds received from ratepayers as security against potential losses arising from failure to pay for services. . . . [Deposits] represent a liability to repay the funds received either after a specified period or upon satisfaction of certain requirements."

13

formula. The utilities are free to use what formula they choose, including or not including deposits. The MPSC has simply regulated one of numerous things that can trickle down and impact rates, but it has not regulated the rate or the rate formula.

¶25. The dictionary definitions of the two terms support this notion. A "rate" is defined as "[a]n amount paid or charged for a good or service." *Rate*, Black's Law Dictionary (10th ed. 2014).[4] A "deposit" is money or property given "to another who promises to preserve it or to use it and return it in kind." *Deposit*, Black's Law Dictionary (10th ed. 2014).

¶26. In addition to containing the domestic violence rule, the MPSC's Rule 9 also provides that utilities may require "a cash deposit to guarantee the payment of any such bills due or which may become due from such customer and safe return of all property belonging to the utility installed at the customer's premises or elsewhere." Miss. Admin. Code § 39-1-2:9.[5] The rule specifies the maximum amount the deposit may be: for residential customers,

---

[4]Incidentally, a "rate base" is defined as "[t]he investment amount or property value on which a company, esp. a public utility, is allowed to earn a particular rate of return." *Rate base*, Black's Law Dictionary (10th ed. 2014).

[5]Rule 9 regulates many aspects of deposits, including a provision that requires a return of deposits to customers over age sixty under certain provisions. Interestingly and confusingly, the Water Association and the majority do not explain why the MPSC has the authority to regulate aspects of the Water Association's members' deposits when it comes to customers of a certain age, yet magically does not have that same authority when it comes to domestic violence victims. Indeed, Rule 9 is the rule that *allows utilities to collect a deposit in the first place*. Miss. Admin. Code § 39-1-2:9 ("Each utility may require from any customer or prospective customer a cash deposit to guarantee the payment of any such bills due . . . ."). And it regulates the maximum deposit amount and the return of deposits. Under the majority's holding, are members of the Water Association now allowed to charge deposits in any amount they want without limit? May its members now decline to return deposits upon cancellation of service, even when a customer has paid his or her balance in full? The majority's holding is far reaching.

"an amount equivalent to a single estimated average bill." *Id.* Additionally, any deposits held for more than one year must accrue interest payable to the customer or credited to the customer's account. *Id.* Thus, the plain meaning of "deposit" designates a sum of money that ultimately belongs to the customer, unless the condition is met that the customer fails to pay his or her bill. This definition of deposit does not fit into the statutory definition of "rate."

¶27. Last, exemptions to jurisdiction are to be construed narrowly. It is noteworthy that the specific statute exempting the water associations' rates from MPSC jurisdiction specifically exempts regulation of "the rates *for the sales and/or distribution* . . .[o]f water or sewage disposal *service. . . .*" The specific language of the exemption contemplates only exempting regulation of "rates" in the typical sense, as in the rate for the sale of water. A deposit, based on its plain language definition, is not a rate for the sale of water.

¶28. The plain meaning of "rate" does not include a "deposit." While the timing of a deposit may have the trickle-down effect of impacting the rates of some utilities, this does not transform the deposit into a "rate" that is beyond the MPSC's jurisdiction.

## 2. Whether the rule regulates internal affairs.

¶29. The MPSC "shall not have jurisdiction over the governance, management or other internal affairs of . . . nonprofit corporations or associations where the governing body of such corporation or association is elected by the consumers thereof or appointed by the county board of supervisors." Miss. Code Ann. § 77-3-5(c) (Rev. 2009). Therefore, if the

15

domestic violence rule regulates the internal affairs of the water associations, the MPSC does not have jurisdiction to apply it to the members of the Water Association.

¶30.　The domestic violence rule regulates the timing, but not the amount, of deposits for a subset of customers. The Water Association argues that such regulation amounts to improper regulation of its members' government, management, or other internal affairs. The Water Association cites Mississippi Code Section 79-11-151, which outlines general corporate powers. The Water Association argues that setting the timing for deposits falls under conducting business in a manner that exempts the timing of deposits from MPSC jurisdiction.

¶31.　The MPSC argues that "business regulation" in which it may not engage includes matters such as hiring and firing employees, setting salaries, or drafting corporate bylaws. But, it argues, this statutory exemption does not "preclude Commission jurisdiction over matters directly affecting the services the utility provides to its customers." Citing cases from other jurisdictions, the MPSC argues that postponing a deposit does not usurp managerial prerogatives or invade the discretion of the corporation over internal governance matters. *See*, *e.g.*, ***Lone Star Gas Co. v. Corp. Comm'n of Okla.***, 39 P.2d 547, 553 (Okla. 1934) ("The powers of the Commission are to regulate, supervise, and control the public service companies in their services and rates, but these powers do not extend to an invasion of the discretion vested in the corporate management. It does not include the power to approve or disapprove contracts about to be entered into, nor to the approval or veto of expenditures proposed.").

16

¶32. The MPSC is empowered to regulate public utilities because the Legislature determined "that the rates, services and operations of public utilities as defined in this title are affected with the public interest and that the availability of an adequate and reliable service by such public utilities to the people, economy and government of the State of Mississippi is a matter of public policy." Miss. Code Ann. § 77-3-2(1) (Rev. 2009). Of course, Section 77-3-5 specifically exempts water associations from MPSC jurisdiction over their rates for the sales and/or distribution of water and over governance, management, or other internal affairs. Yet, construing such exemption narrowly, the MPSC still has jurisdiction over the other services and operations of the water associations. The Water Association's interpretation of the internal affairs exemption would completely exempt its members from any and all MPSC jurisdiction.[6] Simply because management has the capacity to decide something does not automatically render it an "internal affair." The Legislature clearly did not intend to *completely* exempt the water associations from all MPSC regulation. When the Legislature intends to completely exempt entities from MPSC jurisdiction, it has done so explicitly. *See, e.g.*, Miss. Code Ann. § 77-3-1 (Rev. 2009) ("[A]ny public utility . . . owned or operated by a municipality shall not be subject to the provisions of this article . . . ."). Therefore, the regulation of deposits regulates aspects of the utility services provided by the utility, and not its internal affairs.

_____

[6]If the MPSC cannot regulate the timing of a deposit because it is an internal affair, the decision about which must be made by the Water Association members, then can it regulate the quality of water service the Water Association members provide? If the management decides to provide subpar service in order to save money, that would be a management decision, as well, under the Water Association's urged interpretation.

17

### *3. The rule does not violate the APA because it differs from the proposed rule.*

¶33.    The Water Association argues that the domestic violence rule should be struck because it violates the Administrative Procedure Act's (APA) provision regarding variances between the adopted rule and proposed rule.  The APA provides that

> (1) An agency shall not adopt a rule that differs from the rule proposed in the notice of proposed rule adoption on which the rule is based unless all of the following apply:
> (a) The differences are within the scope of the matter announced in the notice of proposed rule adoption and are in character with the issues raised in that notice;
> (b) The differences are a logical outgrowth of the contents of that notice of proposed rule adoption and the comments submitted in response thereto; and
> (c) The notice of proposed rule adoption provided fair warning that the outcome of that rule-making proceeding could be the rule in question.
> (2) In determining whether the notice of proposed rule adoption provided fair warning that the outcome of that rule-making proceeding could be the rule in question, an agency shall consider all of the following factors:
> (a) The extent to which persons who will be affected by the rule should have understood that the rule-making proceeding on which it is based could affect their interests;
> (b) The extent to which the subject matter of the rule or issues determined by the rule are different from the subject matter or issues contained in the notice of proposed rule adoption; and
> (c) the extent to which the effects of the rule differ from the effects of the proposed rule contained in the notice of proposed rule adoption.

Miss. Code Ann. § 25-43-3.107 (Rev. 2010).  The Water Association's primary complaint regarding the differences between the proposed and adopted rules lies with the penalties imposed for violation of the confidentiality provision.

¶34.    This Court must first examine whether the differences between the two rules "are within the scope of the matter announced in the notice of proposed rule adoption and are in character with the issues raised in that notice."  Confidentiality was certainly announced in

18

the notice of proposed rule adoption. Adding "teeth" to the confidentiality provision is within the scope of the matter announced, as it is still within the scope of keeping the information confidential.

¶35. Next, the Court examines whether the "differences are a logical outgrowth of the contents of that notice of proposed rule adoption and the comments submitted in response thereto." Three separate comments, including those of the Attorney General's office, raised concerns about confidentiality. The comments indicated that the confidentiality provision of the proposed rule was not stringent enough. A logical outgrowth of the proposed rule requiring confidentiality and the comments indicating that the confidentiality provision was not stringent enough is making the confidentiality provision more stringent, for example, by adding penalties.

¶36. Third, the proposed rule must have provided fair warning that the final rule could be the outcome of the rulemaking proceeding. In examining this factor, the Court examines first the "extent to which persons who will be affected by the rule should have understood that the rule-making proceeding on which it is based could affect their interests." The Water Association moved to intervene, provided comments and evidence, and testified at the hearing. Clearly, the Water Association should have and did understand that the proceedings could affect its interests. Next, the Court examines the "extent to which the subject matter of the rule or issues determined by the rule are different from the subject matter or issues contained in the notice of proposed rule adoption." The subject matter, waiver of deposit for domestic violence victims and confidentiality of their information, is

19

the same in the proposed and final rules. Last, the Court examines the "extent to which the effects of the rule differ from the effects of the proposed rule contained in the notice of proposed rule adoption." The effects between the proposed and final rules are essentially the same. The penalty added mimics statutory law already in effect in Mississippi, which the original proposed rule would make applicable to members of the Water Association. Section 93-21-109 provides that records maintained by domestic violence shelters are exempt from public disclosure under the Mississippi Public Records Act. Miss. Code Ann. § 93-21-109(1) (Rev. 2013). It then provides that

> Any employee, contractor, volunteer or agent of a domestic violence shelter, or *of any other entity in possession of information which would tend to identify a victim of domestic violence*, who discloses any information that is exempt from disclosure under the Mississippi Public Records Act of 1983, or makes any observation or comment about the identity or condition of any person admitted to a shelter or receiving services of a shelter, unless directed to do so by an order of a court of competent jurisdiction, shall be civilly liable to the person whose personal information was disclosed in the amount of Ten Thousand Dollars ($10,000.00), plus any compensatory damages that the individual may have suffered as the result of the disclosure.

Miss. Code Ann. § 93-21-109(2) (Rev. 2013) (emphasis added). The original proposed rule exposed the water associations to this liability under Section 93-21-109(2), as it placed information regarding domestic violence victims in the hands of utilities. "It is a familiar rule that ignorance of the law excuses no one, or that every person is charged with knowledge of the law." ***Hoskins v. Howard***, 59 So. 2d 263, 269 (Miss. 1952). Thus, the actual effect of adding this language to the rule itself imposes no new liability on the water associations; it merely puts them on better notice that they are exposed to the liability.

20

¶37. Moreover, as the MPSC points out, the Water Association had actual notice of this proposed change before the hearing, made arguments regarding it, and had its expert examine it; thus the Water Association was heard on the issue.

¶38. In sum, the final rule is a logical outgrowth of the proposed rule, and does not have any different effects, thus the rule does not violate the APA.

***4. The rule does not violate the APA because the Economic Impact Statement was legally insufficient.***

¶39. The Water Association argues that the rule is invalid because the economic impact statement (EIS) filed by the MPSC was legally insufficient. Section 25-43-3.105 provides that an economic impact statement must be prepared, and that it must include eleven specific items. Miss. Code Ann. § 25-43-3.105(2) (Rev. 2010). The MPSC filed an EIS that contained all the statutory requirements.

¶40. The statute also provides that

> (3) No rule or regulation shall be declared invalid based on a challenge to the economic impact statement for the rule unless the issue is raised in the agency proceeding. No person shall have standing to challenge a rule, based upon the economic impact statement or lack thereof, unless that person provided the agency with information sufficient to make the agency aware of specific concerns regarding the statement in an oral proceeding or in written comments regarding the rule. *The grounds for invalidation of an agency action, based upon the economic impact statement, are limited to the agency's failure to adhere to the procedure for preparation of the economic impact statement as provided in this section, or the agency's failure to consider information submitted to the agency regarding specific concerns about the statement, if that failure substantially impairs the fairness of the rule-making proceeding.*

Miss. Code Ann. § 25-43-3.105(3) (Rev. 2010) (emphasis added). The Water Association argues that the standard for invalidating the rule is met because it alleges that the MPSC

failed to produce a "meaningful" EIS. It also questions that a new EIS was not created considering the civil liability (and criminal liability, it argues, due to a statute providing that any person violating a MPSC rule is guilty of a misdemeanor) for breaching confidentiality.

¶41. The MPSC argues that the Water Association improperly demands that the EIS take the costs of violating the rule and/or violating contractual obligations into account. Any economic consequence to the utilities assumes that the domestic violence victim will breach his or her utility contract and fail to pay a deposit after the sixty day waiver is up, as well as fail to pay his or her utility bill. Other economic consequences the Water Association argues were not taken into account deal with the civil liability, which requires the assumption that the utility would violate the rule. Because of a lack of Mississippi caselaw on this issue, the MPSC cites the District Court of Appeal of Florida, in a case in which a party challenged the economic impact statement of a Department of Health rule as insufficient because it failed to address the economic consequences of a failure to comply with the rule. *Health Care & Ret. Corp. of Am. v. Dep't of Health & Rehab. Servs.*, 463 So. 2d 1175, 1178 (Fla. Dist. Ct. App. 1984). The court stated that

> Nothing in [the EIS] statute specifically requires a determination of the economic impact of the failure to follow the rule, and we specifically decline to construe the statute as imposing such a requirement in the preparation of economic impact statements. A rule will not be declared invalid merely because the economic impact statement may not be as complete as possible; any deficiency in the statement must be so grave as to have impaired the fairness of the proceedings. . . . The statement accompanying this rule addressed all of the statutory criteria. Appellant has failed to show any deficiency in the economic impact statement that impaired the fairness of the rulemaking proceedings in this instance.

*Id.* Likewise, nothing in the Mississippi statute specifically requires that an EIS evaluate the economic impact of violating the rule. Such a requirement would be overly cumbersome and likely would have endless possibilities.

¶42. The MPSC also argues that the EIS was sufficient. It notes that "[a] rule adopted after July 1, 2005, is invalid unless adopted in substantial compliance with the provisions of Sections 25-43-3.102 through 25-43-3.110." Miss. Code Ann. § 25-43-3.111 (Rev. 2010). Thus, the EIS must substantially comply with the provisions of a statute. The EIS author, the Director of Economics and Planning Division of the Public Utilities Staff, a Ph.D., checked with the public utilities of other states that had implemented similar rules to inquire about the effects. The EIS addressed every statutory factor and the MPSC complied with procedure. The EIS thus substantially complies with the statute, as any alleged deficiency was not so grave as to interfere with the fairness of the proceedings.

¶43. Because I believe that the domestic violence rule does not regulate "rates" under the plain language of the statute, and certainly when we apply a deferential standard of review to the MPSC's interpretation of its own statutes, and because the Water Association's other arguments likewise are without merit, I respectfully dissent.

**DICKINSON, P.J., AND KITCHENS. J., JOIN THIS OPINION.**